# Illinois Official Reports

## Appellate Court

> ## *Ross v. Illinois Central R.R. Co.*, 2019 IL App (1st) 181579

| | |
|---|---|
| Appellate Court Caption | ANTWON M. ROSS, Plaintiff, v. ILLINOIS CENTRAL RAILROAD COMPANY, Defendant and Third-Party Plaintiff-Appellant (Sarmed G. Elias, Third-Party Defendant-Appellee). |
| District & No. | First District, First Division<br>Docket No. 1-18-1579 |
| Filed<br>Rehearing denied | May 6, 2019<br>June 11, 2019 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 15-L-005604; the Hon. Moira Johnson, Judge, presiding. |
| Judgment | Reversed and remanded. |
| Counsel on Appeal | Forde Law Offices LLP (Kevin M. Forde and Joanne R. Driscoll, of counsel) and Fletcher & Sippel LLC (Colleen Konicek and Elizabeth O. Bryant, of counsel), both of Chicago, for appellant.<br><br>Brenner, Monroe, Scott & Anderson, Ltd., of Chicago (Randall C. Monroe and Austin C. Monroe, of counsel), for appellee. |

PRESIDING JUSTICE MIKVA delivered the judgment of the court, with opinion.

Justices Pierce and Griffin concurred in the judgment and opinion.

**OPINION**

¶ 1 The plaintiff in this case is a former railroad employee who alleges he injured his back while attempting to board a moving train. He sued his employer, Illinois Central Railroad Company (Illinois Central or the railroad), and upon investigation of his claim, Illinois Central filed a third-party complaint again the plaintiff's doctor for contribution. Illinois Central now asks us to find that the circuit court abused its discretion when it found that a settlement the plaintiff and his doctor reached was entered into in good faith—a finding that resulted in the dismissal with prejudice of the railroad's contribution claims against the doctor. The railroad also contends that the circuit court erred as a matter of law when it concluded that the common-interest exception applied to prevent waiver of the attorney-client privilege when the plaintiff and his doctor shared attorney-client privileged communications with each other. For the reasons that follow, we agree with Illinois Central on both of these points and we reverse.

¶ 2 I. BACKGROUND

¶ 3 A. Mr. Ross's Injury and Medical Treatment by Dr. Elias

¶ 4 Plaintiff, Antwon Ross, alleges that on January 26, 2013, while employed as a freight conductor by Illinois Central, he fell while attempting to board a moving train and injured his head, neck, and back. Mr. Ross was taken to a local hospital, diagnosed with a compression fracture of the T12 vertebra, treated for a head contusion and scalp laceration, and discharged. Five days later, Mr. Ross began to see third-party defendant Dr. Sarmed Elias, an orthopedic surgeon specializing in minimally invasive spinal surgery. And over the next several years Mr. Ross received treatment from Dr. Elias at facilities owned and operated by Dr. Elias, including two vertebroplasties—which is a spinal injection procedure—a fusion of the T12 and L1 vertebrae, multiple nerve blocks for pain control, steroid injections, dozens of office visits, and 173 physical therapy sessions. Mr. Ross ultimately did not return to work in any capacity and currently collects disability.

¶ 5 Dr. Andrew Zelby, a neurosurgeon, was hired by Illinois Central shortly after the accident to render an opinion as to the reasonableness and necessity of the medical treatment. Mr. Ross failed to keep an appointment for an evaluation by Dr. Zelby, but Dr. Zelby reviewed Mr. Ross's medical records. In August 2013, Dr. Zelby wrote a letter to the railroad that it shared with Mr. Ross, in which Dr. Zelby concluded that Mr. Ross sustained a mild T12 compression fracture that should have healed without any treatment at all. In Dr. Zelby's opinion, none of the procedures performed by Dr. Elias, except perhaps the first vertebroplasty, were reasonable or necessary. Dr. Zelby stated "this treatment must be stopped, *** it is certainly not in the best interests or for the benefit of Mr. Ross," and noted that Mr. Ross "should be treated as a patient, not an annuity." Mr. Ross showed this letter to Dr. Elias but elected to continue treatment with Dr. Elias for three additional years, through the end of 2016.

¶ 6 On June 3, 2015, Mr. Ross sued Illinois Central under the Federal Employers' Liability Act (FELA) (45 U.S.C. § 51 *et seq.* (2012)), claiming that his injuries were the result of Illinois

Central's negligence. Mr. Ross alleged that he was "trained and encouraged by [Illinois Central] to climb on and off rail cars while the train was in motion" and that Illinois Central failed to provide its workers with a safe method for doing so. Illinois Central asserted in its answer and affirmative defenses that Mr. Ross's injuries were, in whole or in part, the result of his own negligence and that Mr. Ross had failed to mitigate his damages by "fail[ing] to follow the advice and recommendations of independent physicians in an effort to alleviate symptoms, promote recovery, and protect [him] from inadequate medical care."

¶ 7    On August 3, 2015, Illinois Central filed a third-party complaint against Dr. Elias, seeking contribution for the *pro rata* share of damages Illinois Central alleged was attributable to negligent treatment by the doctor that "significantly aggravated" Mr. Ross's injuries. In support of its complaint, Illinois Central filed an affidavit by Dr. Zelby, in which Dr. Zelby elaborated on his earlier opinions as follows:

"3. I believe there is reasonable and meritorious cause for this third party complaint against Dr. Elias. His treatment was in large measure excessive and unnecessary. Dr. Elias performed surgeries that were not indicated or appropriate and performed repeated and numerous procedures on Mr. Ross's spine that were completely unnecessary and harmful to Mr. Ross.

4. Mr. Ross did have a T12 compression fracture as a result of his fall, but this was a mild fracture. As a fairly young male with a fracture that had such mild loss of vertebral body height, a kyphoplasty [is] a potential treatment, but it is more likely than not that this fracture would have healed completely with a period of external bracing and no invasive treatment. There was no reason to pursue kyphoplasty at Ll and this treatment was a deviation from the standard of care.

5. A lumbar fusion for the possibility of an interspinous ligament tear is also a deviation from the standard of care. This ligament is not integral in the stability of the spine and a complete tear or even surgical removal of the interspinous ligament such as with a laminectomy does not cause spinal instability or the need for a fusion.

6. Mr. Ross's MRI also revealed very mild degenerative changes in the mid-lower lumbar spine without any neural impingement. In general these mild degenerative changes are typical of the changes that would be expected in a patient in his mid 30s. All of the invasive treatment that Dr. Elias pursued at L2-3, L3-4, L4-5 and L5-S1 was a deviation from the standard of care. Mr. Ross did not have any conditions in his spine that would merit such treatment and this assault on his spine is not consistent with appropriate spine care."

¶ 8    In a report he later prepared for this litigation, Dr. Zelby reiterated his earlier conclusions, further stating:

"Although Mr. Ross reported ongoing complaints of pain, his reported persistence and reported severity of his complaints were inconsistent with the objective medical findings and inconsistent with the natural history of his objective medical condition. This has in large part been promulgated by Dr. Elias. His pursuit of such unnecessary and excessive treatment has had a counterproductive effect on Mr. Ross because it has served to perpetuate the idea of infirmity in Mr. Ross when none has existed. This has also contributed to Mr. Ross'[s] perception of disability and has been medically unscrupulous treatment by Dr. Elias. As it relates to his thoracolumbar injury, Mr. Ross would have been back to full duty work as a conductor by the end of May 2013 with

conservative management in a brace or possibly with a T12 vertebroplasty. *** Mr. Ross'[s] inability to return to work within this timeframe and his claimed inability to work as a conductor since the end of May 2013 have exclusively been related to the unnecessary and egregious treatment of Dr. Elias. *** This treatment was a deviation from the standard of spine care for Mr. Ross'[s] condition. *** Mr. Ross does not require any additional treatment for his spine irrespective of cause. He should be encouraged to pursue a diligent, daily, self-directed range of motion, stretching and core strengthening exercise program both as a mainstay for long term control of his symptoms and also for the general health of his spine. Thank you very much."

¶ 9 Dr. Zelby went on to note a number of discrepancies he observed in Dr. Elias's records:

"I have reviewed various sets of medical records from Dr. Elias'[s] office related to the treatment of Mr. Ross. There are obvious changes to these records that were not related to errors in documentation. The changes in the medical records appear to have been made surreptitiously and were not clearly identified as changes to the original record, as any changes to a medical record should be identified. These changes were made because they were expedient for Dr. Elias and these changes also clearly misrepresent and alter the essence of the original records. The altering of medical records by Dr. Elias was unconscionable and unquestionably a deviation from the standard of care."

¶ 10 Dr. Elias admitted at his deposition that he altered Mr. Ross's medical records, both in response to Dr. Zelby's 2013 letter and after receiving a subpoena for the records from Illinois Central. He testified, however, that he could not recall which changes were made at what time.

¶ 11 Mr. Ross's own expert in this case, Dr. Dennis Gates, agreed with Dr. Zelby that, given the mild nature of his injuries, only one of the procedures Mr. Ross underwent was acceptable. Dr. Gates estimated that without the unnecessary interventions, Mr. Ross should have resumed his work responsibilities within one year of his injury. After some equivocation, Dr. Gates acknowledged at his deposition that many of Mr. Ross's symptoms could have actually been caused by Dr. Elias's treatment:

"Q. Is there an obligation on the part of doctors to report other doctors for medical malpractice?

A. I don't know. Is there? You know, that's an interesting question.

Q. You have a licensing board; right?

A. We do.

Q. Okay.

A. And the patient, however, is—has really not been injured by the procedures done. In order to have a successful malpractice case, you have to have a cause, and you have to have an effect—an affect. He doesn't have that. ***

Q. You state in your comment section trying to understand the continuation of his symptoms, one must consider the adverse effect of the multiple invasive procedures done on his spine?

A. I said that?

Q. You did say that.

A. D***.

Q. So that sounds to me to be a little different from what you just said to me.

A. Yes, it is. And the real answer is I don't know. If we talk to the patient—okay, forgetting about my physical examination, I've got eight things there that the patient relates, all subjective things, the symptoms. Starting with, number one, the headaches; number two, the balance is off; number three, is short-term memory; number four, neck pain; number five, the lower back pain. Number six, sharp pain and jarring his back, and, number seven, pain on lifting anything. And, number eight, is being able to sleep. So could all of those things have been caused by the multiple procedures? I don't know. It's sure possible."

¶ 12    At his own deposition, Mr. Ross testified that he was happy with the care he received from Dr. Elias and that he believed his pain, although it did not go away completely, did get better after the various procedures the doctor recommended. Taura Ross, Mr. Ross's wife, likewise testified that both she and her husband were satisfied with the care that he received from Dr. Elias.

¶ 13                    B. The Settlement Between Mr. Ross and Dr. Elias

¶ 14    In late January 2018, Mr. Ross and Dr. Elias entered into settlement negotiations. The resulting settlement—which was made contingent upon the circuit court's finding that it was entered into in good faith—consisted of a single page. It provided that Dr. Elias would pay Mr. Ross $25,000 "in full settlement of any claim for contribution by [Dr.] Elias regarding any injuries suffered by [Mr.] Ross." The agreement did not discharge or mention the liens Dr. Elias's companies held against Mr. Ross for unpaid medical bills. Dr. Elias was represented during the negotiations by his own personal attorney and paid the settlement amount out of his own funds, although he had professional liability insurance of up to $1 million per claim ($3 million total) and his insurance carrier was not disputing coverage.

¶ 15    In total, Dr. Elias's companies billed Mr. Ross for nearly $1.25 million in medical treatment. At his November 2017 deposition, however—over a year and a half after Dr. Elias stopped treating Mr. Ross—the doctor represented that these bills had not yet been audited or reconciled and that the final numbers would be "much less than that." Indeed, adjustments made in February 2018, when Mr. Ross and Dr. Elias were in settlement negotiations with each other, brought the total outstanding balance down to roughly $870,000. Further adjustments following the announcement of the settlement in March 2018—which Illinois Central claims have not been explained or supported with anything other than spreadsheets produced by Mr. Ross's counsel that reflect this reduction—bring that total to approximately $757,000, or close to $657,000 after deducting insurance payments.

¶ 16    The settlement was announced on March 6, 2018, when Dr. Elias moved for a finding that the settlement had been entered into in good faith and, pursuant to relevant provisions of the Joint Tortfeasor Contribution Act (Act or Contribution Act) (740 ILCS 100/1 *et seq.* (West 2016)), a dismissal of Illinois Central's contribution claim against him. In support of his motion, Dr. Elias described Mr. Ross as having suffered "acute and complex multiple injuries," detailed the various treatments he had provided Mr. Ross over the years, characterized the settlement amount of $25,000 as "well beyond nominal," and noted that Mr. Ross—both at his deposition and in satisfaction surveys he had completed over the years—had repeatedly stated that he was happy with the care he received from Dr. Elias and that he believed his condition had improved following each procedure.

¶ 17        C. The Circuit Court's Discovery Ruling and Finding of Good Faith

¶ 18        In February 2018, anticipating that a settlement might soon be announced, Illinois Central served Mr. Ross and Dr. Elias with discovery requests seeking "all documents or communications, including but not limited to joint defense agreements," between Dr. Elias or his counsel and Mr. Ross or his counsel. The railroad issued subpoenas to counsel representing Dr. Elias and Mr. Ross seeking these same documents. In his responses, Dr. Elias made clear that he and Mr. Ross had entered into "no 'joint defense agreement,' or any other agreements relating to the defense of this case, other than the settlement agreement." He nevertheless objected to the requests on the grounds that the communications sought were attorney-client privileged and that the sharing of those communications between Dr. Elias, Mr. Ross, and their respective counsel did not waive the privilege. Illinois Central moved to compel discovery and Dr. Elias moved to quash the subpoenas. The circuit court ordered Dr. Elias and Mr. Ross to produce privilege logs and submit certain documents for *in camera* inspection, which they did. Following briefing and argument, the court sustained Dr. Elias's objections, concluding, based on its reading of this court's recent opinion in *Selby v. O'Dea*, 2017 IL App (1st) 151572, that the common-interest exception applied to prevent waiver of the attorney-client privilege.

¶ 19        Following additional briefing and another hearing, the circuit court granted Dr. Elias's motion, finding the settlement between Dr. Elias and Mr. Ross was entered into in good faith. The court explained its ruling as follows:

> "I'm ready to rule. At this time, the Court is finding that there is a good faith settlement entered into by the plaintiff and Dr. Elias, and the third-party complaint that was brought by Illinois Central Railroad for contribution is the subject matter of a good faith finding. The defendant/third-party plaintiff would be entitled to a $25,000 setoff in the case.

> And just as an aside, unlike a lot of the good faith settlement motions that I've had to entertain where a party who settles results in an empty chair being at the desk, here all of the arguments that the defendant/third-party plaintiff makes about the care and treatment that was rendered by Dr. Elias to the plaintiff are still at issue. The injury and whether it's proximately caused by any breach of duty or conduct of the defendant is still at issue. The nature, extent, and duration of any injuries is still at issue. Dr. Elias is still a witness in this case who will be brought out to testify and [be] cross-examined in this matter. And whether or not the jury agrees that any and all of the bills that Dr. Elias has said are as a result of his treatment will be agreed upon by the jury as a damage or not is still the subject matter for this trial.

> So I will grant the motion, and that will be the order."

¶ 20        Because this finding cut off any liability Dr. Elias bore for Mr. Ross's injuries or prolonged recovery, the court dismissed with prejudice Illinois Central's third-party complaint for contribution against the doctor. Illinois Central appealed, and further proceedings were stayed pending the outcome of this appeal.

¶ 21                            II. JURISDICTION

¶ 22        The circuit court entered its order finding the settlement between Dr. Elias and Mr. Ross was entered into in good faith and dismissing Illinois Central's contribution claims against Dr. Elias on July 23, 2018. The court also made a finding, pursuant to Illinois Supreme Court Rule

304(a) (eff. Mar. 8, 2016), that there was "no just reason to delay enforcement or appeal of th[e] order." Illinois Central filed its notice of appeal challenging the July 23 order the next day. Pursuant to Rule 303(b)(5) (Ill. S. Ct. R. 303(b)(5) (eff. July 1, 2017)), it then filed an amended notice of appeal on August 21, 2018—within the original 30-day period for filing notice—to expressly include "all other prior nonfinal orders that were a step in the procedural progression" leading to the July 23 order, including "all orders pertaining to rulings on discovery motions that deprived [Illinois Central] of the ability to discover communications between [Mr. Ross] and [Dr.] Elias and their respective counsel that could have supported [Illinois Central]'s objections to the Motion for Good Faith Finding." We thus have jurisdiction to consider both the circuit court's June 11, 2018, discovery ruling and the court's July 23, 2018, finding of good faith and dismissal of Illinois Central's contribution claims against Dr. Elias.

### III. ANALYSIS
#### A. The Circuit Court's Finding of a Good-Faith Settlement

Sections 2(c) and 2(d) of the Contribution Act provide that a tortfeasor who settles "in good faith" with an injured party is no longer liable for contribution; any remaining tortfeasor is entitled only to a setoff in the amount of the settlement. 740 ILCS 100/2(c), (d) (West 2016). Whether a settlement was entered into in good faith is a decision within the circuit court's discretion. *Antonicelli v. Rodriguez*, 2018 IL 121943, ¶ 23. There is no precise formula for determining when a settlement has been made in good faith. *Id.* The Act itself does not define the term, and our supreme court has held that courts must consider the totality of the circumstances in light of two important public policies: the encouragement of legitimate settlements and the equitable apportionment of damages among tortfeasors. *Id.* ¶¶ 23-24.

Although it is the settling parties' burden to make an initial showing of good faith, due to the strong public policy favoring the voluntary resolution of claims, this burden is met simply by showing that the settlement is legally valid. *Id.* ¶ 24. Illinois Central does not dispute that Dr. Elias has done so here. After this preliminary showing has been made, the burden shifts to the challenging party to establish the absence of good faith by a preponderance of the evidence. *Johnson v. United Airlines*, 203 Ill. 2d 121, 132 (2003). Courts are "to be on guard for any type of evidence of collusion, unfair dealing or wrongful conduct by the settling parties." *In re Guardianship of Babb*, 162 Ill. 2d 153, 162 (1994). Factors considered include (1) the reasonableness of the amount paid compared to the settlor's fair share of liability, (2) the relationship between the settling parties, (3) whether the plaintiff sued the settlor, and (4) whether efforts were made to conceal the circumstances surrounding the settlement. *Palacios v. Mlot*, 2013 IL App (1st) 121416, ¶ 22. Illinois Central contends that it made this showing here and that the circuit court abused its discretion when it concluded otherwise. We agree.

In our view, the strongest evidence of a lack of good faith is the amount that Dr. Elias paid when compared to what could have been his fair share of liability. Our supreme court has made clear that in making this assessment, the circuit court is not required to hold an evidentiary hearing to determine the precise amount of the overall damages or of the settling tortfeasor's proportionate liability. *Antonicelli*, 2018 IL 121943, ¶ 27. Rather, it is to look to the totality of the circumstances, including the amount paid, the amount that the settling defendant could pay (considering insurance coverage), the amount of the plaintiff's claims, and the defenses of the

settling and nonsettling defendants. See *id.* ¶ 26; *Johnson*, 203 Ill. 2d at 139-40. Of course, it will be for the trier of fact to ultimately determine Dr. Elias's liability, if any, based on all of the evidence presented at trial, including any experts that Dr. Elias may present to refute the opinions of Dr. Zelby and Dr. Gates. But on the record before us—and particularly in light of the testimony of Mr. Ross's own expert, which aligns significantly with the opinions of the railroad's expert—Dr. Elias has significant potential liability.

¶ 28 As Illinois Central repeatedly stresses, this is a FELA case; unlike a workers' compensation claimant, as an injured railroad worker Mr. Ross can seek current and future wages, as well as noneconomic damages without statutory limits. Illinois Central estimates that Mr. Ross's claim, including the liens for the medical bills, future earnings, and loss of pension benefits, will total over $3.5 million. Dr. Elias paid $25,000 and does not dispute that he has insurance coverage of $1 million.

¶ 29 We view these dollar amounts in light of the evidence that will likely be presented at trial. While Dr. Elias has not yet had occasion to engage his own expert, two doctors—Dr. Zelby and Dr. Gates—have provided evidence that a significant part of Mr. Ross's current injury may be due to Dr. Elias's malpractice and unnecessary treatment. Dr. Elias asks us to discount these expert opinions because the experts' reports were not available at the time of the settlement and thus could not undermine the good faith of the settling parties. But Dr. Zelby made his opinions clear as early as 2013 in letters shown to Dr. Elias by Mr. Ross. An affidavit setting out his opinions was also attached to the railroad's third-party complaint against Dr. Elias, filed in August 2015. And the record reflects that Mr. Ross engaged Dr. Gates five to six months before the settlement was reached.

¶ 30 In short, there was undeniably damning evidence from the railroad's expert regarding Dr. Elias's deviations from the standard of care and reason to believe that the settling parties were aware of corroborative testimony from Mr. Ross's own medical expert. Dr. Elias had an insurance policy covering up to $1 million per claim, and there is no reason to believe that he could not pay a substantial judgment. Mr. Ross had a potential claim of several million dollars. Against all of this, a finding that a settlement of $25,000 was entered into in good faith was an abuse of discretion.

¶ 31 We came to the same conclusion in *Warsing v. Material Handling Services, Inc.*, 271 Ill. App. 3d 556, 560-62 (1995), a wrongful death case in which the estate of a worker killed when a forklift fell on him settled for $1000 with the deceased's coworker and friend, who was operating the forklift. There, as here, the plaintiff had failed to sue a potentially liable party because of the relationship between the parties, and the settlement was small in comparison to both the settlor's potential liability and his available insurance coverage. *Id. Warsing* was abrogated in part by our supreme court's decision in *Johnson*, 203 Ill. 2d 121, but only on the grounds that it and other earlier cases had required a party challenging a settlement to present clear and convincing evidence that the settlement was not entered into in good faith. After *Johnson*, an absence of good faith need only be shown by a preponderance of the evidence. *Id.* at 132.

¶ 32 Illinois Central also points to the amount of the liens that remain pending, which will allow Dr. Elias to easily recoup the $25,000 he paid as long as Mr. Ross is able to recover at least that much from Illinois Central. We recognized in *Cleveringa v. J.I. Case Co.*, 192 Ill. App. 3d 1081, 1085 (1989), that the presence of a lien from a settling party against a nonsettling party does not preclude the finding of a good-faith settlement. But in that case the workers'

compensation lien was $275,000 and the settlement was for $1.1 million. Here, Dr. Elias could recover through his liens many multiples of the settlement amount he paid to Mr. Ross. Dr. Elias has pointed us to no case in which a good-faith finding was made and the lien that remained against the nonsettling party was more than the settlement, let alone many times the settlement amount, like the liens in this case.

¶ 33 Dr. Elias's only response is that his liens are for services actually rendered and belong to his companies, while the settlement was with him directly. However, he does not dispute that he is the sole owner of the companies, with both the power to waive the liens and the expectation of benefitting from their payment. Although we agree with Dr. Elias that this is not a "loan-receipt agreement" case like *Babb*, 162 Ill. 2d at 168—where the settlement amount functioned as an interest-free loan from the settling defendant to the plaintiff, to be repaid from any recovery against remaining defendants—the fact remains that Dr. Elias's significant liens against Mr. Ross, for services of disputed necessity and value to Mr. Ross, significantly eclipse the modest amount of the settlement.

¶ 34 Dr. Elias argues repeatedly that one of the two principles underlying the Contribution Act is the encouragement of settlements. But as our supreme court has made clear, the relevant legislative intent is the desire "to encourage settlement of the *entire* litigation." (Emphasis in original.) *Id.* at 178. Here, as in *Babb*, a settlement with one potentially liable party has the perverse effect of practically guaranteeing that settlement of the litigation as a whole will not occur. If he hopes to pay what he owes Dr. Elias, Mr. Ross cannot agree to settle with Illinois Central for anything less than the amount of the doctor's outstanding liens. And because the portion of those liens the railroad insists is attributable to Dr. Elias's deviations from the standard of care and not to any negligence on its part pales in comparison to the $25,000 Dr. Elias paid to extricate himself from this case, the remaining case between Mr. Ross and Illinois Central has become increasingly difficult to settle.

¶ 35 Illinois Central also argues that evidence of collusion between Dr. Elias and Mr. Ross shows an absence of good faith. The railroad points to testimony that there was a strong affinity and close relationship between Mr. Ross and Dr. Elias, to the point where Mr. Ross's own expert, Mr. Gates, opined that Mr. Ross had developed a "psychological dependence" on Dr. Elias and "believe[d] strongly that he would be paralyzed and not have a sexual function if he had not had all [of the] procedures by Dr. Elias." Mr. Ross did not elect to sue Dr. Elias himself. In fact, he did not even seek a second opinion in 2013 when he was confronted with Dr. Zelby's criticism of Dr. Elias's treatment. And he continued to trust Dr. Elias after both Dr. Zelby and Dr. Gates stated that nearly all of the treatment provided by Dr. Elias was unnecessary and potentially harmful. The railroad also notes that Dr. Elias assisted Mr. Ross in obtaining disability benefits and points to the unexplained alteration of his office notes and reductions to his medical bills. Dr. Elias acknowledged that he altered some of his office notes in response to Dr. Zelby's 2013 letters and that he made some changes after Illinois Central subpoenaed his records. All of this certainly adds further support to our conclusion that the finding of good faith was an abuse of discretion.

¶ 36 B. The Common-Interest Exception to the Waiver of<br>Attorney-Client Privilege

¶ 37 Illinois Central also appeals the circuit court's ruling sustaining Dr. Elias's objections to its discovery requests seeking all communications between Mr. Ross, Dr. Elias, and their

respective counsel. The circuit court agreed with Dr. Elias that, although Mr. Ross and Dr. Elias had entered into "no joint defense agreements or any other agreements relating to the defense of [the] case," their sharing of attorney-client privileged communications did not waive the privilege because they shared two common interests: "(1) establishing the necessity of [Mr. Ross's] treatment; and (2) establishing and maximizing the liability of [Illinois Central]." Illinois Central's position is that, regardless of the contents of the documents, which the circuit court reviewed *in camera*, as a matter of law the common-interest exception to the waiver rule cannot apply. Whether a privilege applies or has been waived is a question of law we review *de novo*. *Center Partners, Ltd. v. Growth Head GP, LLC*, 2012 IL 113107, ¶ 27.

¶ 38    The overarching principal governing discovery in litigation is that a party may obtain "full disclosure regarding any matter relevant to the subject matter involved in the pending action." Ill. S. Ct. R. 201(b)(1) (eff. July 30, 2014). A well-established but narrowly construed exception to this rule protects attorney-client communications from disclosure. See Ill. S. Ct. R. 201(b)(2) (eff. July 30, 2014). When a client discloses a privileged communication to a third party, however, "that particular communication is no longer privileged and is discoverable or admissible in litigation." *Center Partners, Ltd.*, 2012 IL 113107, ¶ 35. But there is an exception to such waiver that allows "parties with a common interest in defeating a litigation opponent" to share information relating to that interest with each other without destroying the privilege. See *Selby*, 2017 IL App (1st) 151572, ¶ 42 (collecting cases).

¶ 39    Our supreme court first recognized what it called the "common interest doctrine" in *Waste Management, Inc. v. International Surplus Lines Insurance Co.*, 144 Ill. 2d 178 (1991). There, the owner and operator of a hazardous waste disposal site sought indemnification from its insurer for costs it had incurred in litigation relating to the migration of toxic waste from the site. *Id.* at 186. The insurer refused coverage, arguing that by failing to advise it of separate litigation between the insured and the prior owners of the site, the insured had breached a cooperation clause in the policy. *Id.* at 187. During discovery, the insurer sought the files of the insured's counsel in both lawsuits, asserting that both cases were matters of common interest to the parties. *Id.* The insured objected, asserting attorney-client privilege and work product protection. *Id.* On review, our supreme court held that the communications were discoverable. The court first noted that, under the broadly worded cooperation clause in the parties' policy, the insured had a duty "to assist [the insurer] in the conduct of suits and in enforcing any right to contribution or indemnity against persons potentially liable to insureds." *Id.* at 192. It concluded that "[a] fair reading of the terms of the contract render[ed] any expectation of attorney-client privilege *** unreasonable." *Id.* at 192-93. The court held that the common-interest doctrine, historically used to defeat claims of privilege between two parties jointly represented by the same lawyer applies equally "where the attorney, though neither retained by nor in direct communication with the insurer, acts for the mutual benefit of both the insured and the insurer." *Id.* at 194.

¶ 40    Thus, in *Waste Management*, the common-interest doctrine was employed to *defeat* a claim of privilege. Recently, in *Selby*, 2017 IL App (1st) 151572, ¶¶ 2, 28-29, this court held that a common interest could be used—as Dr. Elias seeks to use it here—to defend against a claim that the attorney-client privilege was waived. The plaintiffs in *Selby* filed a class-action lawsuit alleging that their insurance company and its lawyer had engaged in a large-scale scheme to circumvent the law governing service of process and obtain fraudulent default judgments against the plaintiffs in subrogation cases. *Id.* ¶ 7. Pursuant to a joint defense agreement, the

- 10 -

lawyer and the insurance company withheld from the plaintiffs privileged documents they had shared with each other, asserting what they called a "joint defense privilege." *Id.* ¶¶ 2, 29-30.

¶ 41        Following a thorough review of the relevant authorities, trends in the law, and competing policy interests (see *id.* ¶¶ 34-70), the *Selby* court ultimately recognized a "common-interest exception to the waiver rule in Illinois" (*id.* ¶ 71). The *Selby* court also clarified that it was not establishing a new and independent privilege, but merely recognizing an exception to the general rule that the disclosure of privileged documents to third parties destroys the privilege *Id.* ¶ 40.

¶ 42        Dr. Elias successfully argued in the circuit court that under *Selby*, the common-interest exception prevented a waiver of privilege when he and Mr. Ross shared lawyer-client communications during their settlement negotiations in this case. We do not agree. The *Selby* court left for another day certain determinations that would define the scope of the common-interest exception—whether, for example, it "extends beyond actual cases to potential litigation, *** beyond litigation interests to other interests, and whether a written common-interest agreement is required or the extent to which the parties must establish some form of advance agreement to confidentially share information." (Emphases omitted.) *Id.* ¶ 73. We need not answer these questions to conclude that the exception does not apply in this case.

¶ 43        The parties in *Selby* conferred with each other only after executing a written joint defense and confidentiality agreement. *Id.* ¶¶ 2, 36, 74. It is clear to us from that case, and the authorities relied on therein, that some form of agreement between the parties must exist for the exception to be invoked. The *Selby* court stated that it concurred with the "many courts that have held that direct client-to-client communications are protected by the common-interest exception to the waiver rule *when they occur pursuant to a common-interest agreement*, they are in furtherance of that common interest, and they take place with counsel present." (Emphasis added.) *Id.* ¶ 103. Section 76 of the Restatement (Third) of the Law Governing Lawyers, quoted and discussed by the *Selby* court, also stresses the importance of a common-interest agreement:

> "(1) If two or more clients with a common interest in a litigated or nonlitigated matter are represented by separate lawyers and they agree to exchange information concerning the matter, a communication of any such client that otherwise qualifies as privileged under [the attorney-client privilege] that relates to the matter is privileged as against third persons." Restatement (Third) of the Law Governing Lawyers § 76 (2000).

¶ 44        Dr. Elias's position is that no prior agreement to share privileged communications is necessary, so long as the communications relate to a common interest shared by the parties. We cannot agree. The attorney-client privilege belongs to, and can only be waived by, the client. *Center Partners, Ltd.*, 2012 IL 113107, ¶ 35. Waiver occurs when the client behaves in a way that is inconsistent with the confidentiality the privilege is meant to protect. As our supreme court has noted, disclosure to a third party generally results in waiver because it "is *inherently inconsistent* with the policy behind the privilege of facilitating a confidential attorney-client relationship." (Emphasis added and internal quotation marks omitted.) *Id.* Even when a common interest exists between parties, it is clear to us that the client must, at the time of the disclosure, have an agreement with the receiving party that that party will treat the information as privileged. A disclosure in the absence of such an agreement is simply inconsistent with a desire to maintain the confidentiality of the privileged communications.

¶ 45    Here, Dr. Elias made clear in his discovery responses that he and Mr. Ross had no such agreement, written or otherwise. For this reason alone, and without reaching any of the other reasons that Illinois Central distinguishes this case from *Selby*, it is clear to us that the common-interest exception to the waiver rule does not apply here.

¶ 46                              IV. CONCLUSION

¶ 47    For the foregoing reasons, we reverse the circuit court's finding of a good-faith settlement between Mr. Ross and Dr. Elias, reverse the court's ruling sustaining Dr. Elias's objections to Illinois Central's discovery requests, and remand for further proceedings consistent with this opinion.

¶ 48    Reversed and remanded.