# Illinois Official Reports

## Appellate Court

---

### *Daniels v. Arvinmeritor, Inc.*, 2019 IL App (1st) 190170

---

| | |
|---|---|
| Appellate Court Caption | SHARON DANIELS, Individually and as Special Administrator for the Estate of Patrick M. O'Reilly, Deceased, Plaintiff-Appellee, v. ARVINMERITOR, INC.; CBS CORPORATION, f/k/a Viacom, Inc., Merger to CBS Corporation, f/k/a Westinghouse Electric Corporation; CRANE CO., Individually and as Successor in Interest to Cochrane, Inc., a/k/a Jenkins Valves, Inc., and Successor in Interest to Chapman Valves; CSR, LTD., a/k/a Consolidated Sugar and Refining; FLOWSERVE CORPORATION, Individually and as Successor in Interest to BW/IP International, Inc., f/k/a Byron Jackson Pump Division and Successor in Interest to Edward Valves; FOSTER WHEELER ENERGY CORPORATION, Individually and as Successor in Interest to C.H. Wheeler; GENERAL ELECTRIC COMPANY; JOHN CRANE, INC.; METROPOLITAN LIFE INSURANCE COMPANY; TRANE US, INC., f/k/a American Standard, Inc.; and WEIL-MCLAIN COMPANY, Defendants (John Crane, Inc., Defendant-Appellant). |
| District & No. | First District, Fourth Division<br>No. 1-19-0170 |
| Filed | December 19, 2019 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 16-L-11308; the Hon. Clare E. McWilliams, Judge, presiding. |

| | |
|---|---|
| Judgment | Affirmed. |
| Counsel on Appeal | Michael A. Pollard, Michael C. McCutcheon, and Michael D. Lehrman, of Baker & McKenzie LLP, of Chicago, for appellant. |
| | Klint L. Bruno, of The Bruno Firm LLC, of Chicago, and Jennifer Gelman, Ethan Flint, Troyce Wolf, and Demetrios Zacharopoulos, of Flint Law Firm LLC, of Edwardsville, for appellee. |
| Panel | JUSTICE REYES delivered the judgment of the court, with opinion. Presiding Justice Gordon and Justice Lampkin concurred in the judgment and opinion. |

## OPINION

¶ 1     The plaintiff, Sharon Daniels, as the special administrator of Patrick O'Reilly's estate, brought an action in the circuit court of Cook County against John Crane, Inc. (John Crane), and other manufacturers of asbestos-containing products, claiming O'Reilly's exposure to these asbestos products caused him to develop pleural mesothelioma. As the matter proceeded in the circuit court, the other defendants settled, leaving John Crane as the only remaining defendant at the time of trial. Following the trial, the jury found in plaintiff's favor and awarded damages in the amount of $6,022,814.06. Following the verdict, the trial court directed a $1,137,500 setoff consisting of the settlement amounts and entered judgment on the verdict in the amount of $4,885,314.06. John Crane later filed a posttrial motion for a new trial, which was denied.

¶ 2     On appeal, John Crane contends that the trial court erred in denying its posttrial motion because it (1) allowed one of plaintiff's medical experts to improperly testify that the "cumulative dose" of O'Reilly's exposure to all asbestos products caused his injuries, (2) provided inaccurate instructions to the jury regarding proximate cause and the state of the art in asbestos cases, (3) failed to include four settled defendants on the jury verdict form, and (4) did not properly analyze certain settlement agreements prior to entering findings of good faith. For the reasons that follow, we affirm.

¶ 3                                    BACKGROUND
¶ 4     Because of the limited issues raised on appeal, we recite only those facts relevant to the claims presented.

¶ 5     O'Reilly was a union pipefitter in Chicago from 1957 to 1998. In October 2016, O'Reilly was diagnosed as having pleural mesothelioma, a cancer of the lining surrounding the inside of the chest wall and the surface of the lung.

¶ 6        On November 17, 2016, O'Reilly filed a complaint alleging negligence, willful and wanton conduct, civil conspiracy, negligent spoliation of evidence, willful and wanton spoliation of evidence, and loss of consortium claims against John Crane and other manufacturers of asbestos-containing products. O'Reilly alleged that his injuries occurred due to the exposure to asbestos at his workplace. O'Reilly died from mesothelioma in April 2017. His daughter Sharon Daniels, as representative of his estate, became the plaintiff. The complaint was amended to add survival and wrongful death claims.

¶ 7        In anticipation of trial, Crane Co. (a separate defendant) filed a motion *in limine* to exclude the testimony of plaintiff's expert witness, Dr. Jerrold Abraham.[1] John Crane joined in the motion. Relevant to this appeal, the motion sought to exclude Dr. Abraham's testimony because it did not meet the requirements for testimony establishing causation under Illinois law. Specifically, John Crane argued that Dr. Abraham based his opinions on O'Reilly's "asbestos exposure (cumulative)" and that this testimony failed to meet the "frequency, regularity, and proximity" standard for causation testimony adopted by the Illinois Supreme Court in *Thacker v. UNR Industries, Inc.*, 151 Ill. 2d 343 (1992). At argument on the motion *in limine*, John Crane further argued that Dr. Abraham's testimony should be excluded because it did not meet the *Frye* standard as his opinions amounted to a generally unaccepted scientific theory that "each and every" exposure to asbestos fibers causes disease. The trial court denied the motion *in limine*.

¶ 8        Before the commencement of the trial, numerous defendants except John Crane were dismissed, either because of general dismissals or through settlements.[2] Four of the eight defendants who settled sought good faith findings from the trial court: Trane US, Inc. (Trane); Weil-McLain Company (Weil-McLain); Crane Co.; and CBS Corporation, f/k/a Westinghouse Electric Corporation (Westinghouse).[3] John Crane objected to the good faith findings as to Trane and Westinghouse, arguing that plaintiff had not disclosed the settlement amounts or the allocation of liability. The trial court overruled the objections and entered the good faith findings.

¶ 9        The matter then proceeded to trial where plaintiff presented evidence with regard to the decedent's injuries and subsequent death, the family's loss as a result of his death, John Crane's knowledge of the dangers of asbestos, and John Crane's failure to notify the decedent of these known dangers. We will, however, summarize only the evidence relevant to the issues discussed in this opinion.

¶ 10        As already indicated, O'Reilly worked as a pipefitter at various locations in Chicago from 1957 to 1998. Details about O'Reilly's work were presented to the jury through two videotaped depositions that were conducted prior to his death. According to O'Reilly, his work as a pipefitter involved primarily replacing and installing valves and gaskets. The valves were manufactured by Crane Co., Chapman Valves, Edward Valves, Jenkins Valves, Inc., Jamesbury, Westinghouse, Powell, and Leslie. The gaskets were manufactured by Garlock and

---

[1]Crane Co. is an entirely separate entity and is not related to defendant John Crane in any capacity. Furthermore, Crane Co. is not a party to this appeal.

[2]We further note that there is no dismissal order in the record for defendant Metropolitan Life Insurance Company; however, no arguments are made on appeal regarding this defendant.

[3]The finding of good faith as it pertained to Westinghouse's settlement was entered prior to the jury verdict.

John Crane. The packing material that was used to form a seal between the gasket and the pipe was also manufactured by John Crane. O'Reilly testified that at the time he was working with these products he was unaware that they contained asbestos.

¶ 11    In order to replace the valves and gaskets, O'Reilly had to remove the insulation that surrounded the pipe. Removing the insulation created dust, which he inhaled, and he only wore a mask "once in a while." To remove the gaskets, he first had to remove the packing material that surrounded the gasket. In order to do so, he needed to remove the packing material with a pick, chisel, and hammer to complete the task. This process also created dust which he inhaled. Once the packing was removed, he would dislodge the old gasket with a scraper and a wire brush. Occasionally this work would require the use of an electric sander. This too generated dust that he would inhale. O'Reilly then had to fit the new gasket to the pipe, which at times required him to modify the precut gaskets to fit the flanges, which he did in the pipefitter's shop. This involved cutting the gasket and punching holes in it for the insertion of bolts. According to O'Reilly, he worked with John Crane gaskets and packing on a daily basis.

¶ 12    Plaintiff, through the expert testimony of Dr. Arnold Brody, PhD, introduced evidence regarding the general nature of asbestos. Dr. Brody explained that there are three different types of asbestos, all which cause cancer: crocidolite (the most potent), amosite (the next most potent), and chrysotile (the least potent). Dr. Brody further explained that asbestos fibers are microscopic and are thus not visible to the naked eye. One million asbestos fibers can sit on the head of a pin and one billion asbestos fibers can sit on the tip of our finger. These fibers are odorless and tasteless, thus there is no way for an individual to know when asbestos enters the body. As it relates to the lungs, asbestos can cause lung cancer and mesothelioma. According to Dr. Brody, asbestos exposure is the only known cause of mesothelioma in the United States. While asbestos fibers are in the ambient air we breathe, this "background" exposure rarely causes cancer—only one in a million individuals contract cancer in this way.[4]

¶ 13    Dr. Gerald Markowitz, PhD, a professor of history, testified as an expert regarding the history of asbestos disease. According to Markowitz, the risk of asbestos was first discovered in England in 1898. In 1918, the U.S. Bureau of Labor Statistics reported that workers and bystanders exposed to asbestos were at risk of disease. Thereafter, in 1936, the Illinois state legislature specifically mentioned asbestos as a dangerous substance and provided compensation for workers injured by exposure to asbestos. By 1964, the United States government and those in the asbestos industry were aware of the risks of asbestos exposure through a conference organized by a preeminent asbestos researcher, Dr. Selikoff. Subsequently, in 1972 the United States Occupational Safety and Health Administration (OSHA) was established to regulate asbestos.

¶ 14    Plaintiff's expert Dr. Abraham, a board-certified physician in anatomic pathology, testified regarding the cause of O'Reilly's mesothelioma. After reviewing O'Reilly's medical records, work history, deposition testimony, and pathology slides, Dr. Abraham opined that O'Reilly's exposure to asbestos from his work with John Crane gaskets and packing was a substantial contributing factor in the development of his pleural mesothelioma. Dr. Abraham explained that there are no known safe levels of asbestos exposure, "even seemingly trivial exposures

---

[4]Another expert witness for plaintiff explained that the outdoor concentration of background asbestos, *i.e.*, that asbestos, which is naturally occurring in the air we breathe, is 0.00039 fibers per cubic centimeter.

can cause it." In addition, asbestos disease is a "dose-response disease," so the more exposure an individual has to asbestos dust the more likely they are to contract the disease. But once someone has sustained an asbestos related disease, it does not matter whether they have had a low exposure or high exposure to asbestos. If there is documentation that they have had asbestos exposure, it is not really sufficiently logical to relate their asbestos disease to anything other than their asbestos exposure.

¶ 15    When specifically asked whether O'Reilly's exposure to John Crane gaskets and packing from 1957 through 1985 would be consistent with a mesothelioma diagnosis in 2016, Dr. Abraham replied that it would. Dr. Abraham explained that mesothelioma has a very long latency and therefore it could take decades for mesothelioma to develop after asbestos exposure. Dr. Abraham also testified regarding how to measure an individual's level of asbestos exposure. According to Dr. Abraham, one's history of asbestos exposure is the only way to measure the level and that pleural mesothelioma is itself indicative of a "substantial exposure" to asbestos.

¶ 16    On cross-examination, Dr. Abraham testified that the body has natural defense mechanisms that work to inhibit asbestos fibers from remaining in the lungs. Dr. Abraham also acknowledged that it is theoretically possible to have an occupational exposure to asbestos that is not substantial and defined that exposure as "one fiber more than background." [5] Dr. Abraham also acknowledged that O'Reilly worked around blocks of friable insulation that would have contained trillions of asbestos fibers if released. Lastly, Dr. Abraham opined that all of the asbestos-containing products to which O'Reilly was exposed were a "substantially contributing factor" to the cause of his mesothelioma. According to Dr. Abraham, no one brand would be totally responsible, unless it were the only brand to which he was exposed.

¶ 17    William Ewing, a certified industrial hygienist, testified as an expert on behalf of plaintiff. Ewing opined that by working with John Crane's gaskets and packing, O'Reilly had "significant exposure" to asbestos. Ewing acknowledged that John Crane's gaskets and packing were made of encapsulated asbestos. He opined, however, that O'Reilly was exposed to asbestos from John Crane products when O'Reilly used picks, chisels, and hammers to remove the packing material. He further opined that O'Reilly was exposed to asbestos when he used wire brushes and sanders to dislodge or reshape John Crane gaskets. In handling the gaskets and packing in this manner, asbestos dust would have been released in the air and inhaled by O'Reilly. Ewing testified that the outdoor concentration of background asbestos in the air is 0.00039 fibers per cubic centimeter. In contrast, Ewing opined that the range of asbestos fibers O'Reilly would have been exposed to when removing and installing gaskets was 0.05 to 1 fibers per cubic centimeter and when removing packing was 0.05 to 2 fibers per cubic centimeter. According to Ewing, this is a "significant increase in exposure" over background.

¶ 18    During Ewing's cross-examination, John Crane established that O'Reilly was exposed to asbestos-containing block insulation and pipe covering that would have resulted in significant asbestos exposure. Specifically, Ewing opined that the air concentration when removing friable asbestos piping insulation was 16 to 136 fibers per cubic centimeter and that a bystander to the removal of such insulation would be exposed to 2 to 78 fibers per cubic centimeter. Removal

_____

[5]The amount of asbestos that naturally occurs in the air we breathe is 0.00039 fibers per cubic centimeter.

of a small piece of pipe insulation would have exposed O'Reilly to significant exposures of 1 to 3 fibers per cubic centimeter. Accordingly, this means that O'Reilly was likely exposed to asbestos from other products, not solely those manufactured by John Crane. Ewing further testified that if the gasket was not scraped there would be no exposure to asbestos because the asbestos fibers were encapsulated. Similarly, there would be no exposure to asbestos if the packing was wet when handled.

¶ 19    George McKillop, John Crane's corporate representative, testified in a videotaped evidence deposition that John Crane sold products containing asbestos from the 1930s until July 31, 1985. The company, in 1970, first learned that asbestos could cause numerous diseases such as asbestosis and mesothelioma. Due to government regulations of asbestos, in 1983, John Crane commenced placing warning labels on its products. During the 1970s, it was the practice at John Crane's manufacturing plant to wet the gaskets and packing material prior to manipulating them to avoid working with dry products and dust exhaust mechanisms were used in the factory. John Crane was aware that individuals who removed its gaskets did so using paint scrapers and wire brushes. John Crane was also aware that individuals would cut the gaskets by hitting them with hammers and cutting them with tin snips or regular cutters. McKillop further testified to one of John Crane's "Material Safety Data Sheets," which identified John Crane's products as containing 60 to 80% asbestos as of 1981. According to McKillop, John Crane products played no role whatsoever in causing a person's asbestos disease.

¶ 20    As plaintiff's witness, George Springs, another corporate representative of John Crane, testified that John Crane sold asbestos and nonasbestos gaskets and packing. As defendant's witness, Springs testified, based on O'Reilly's deposition testimony, that he could not identify what John Crane products O'Reilly worked with nor did John Crane have any sales records to companies for which O'Reilly worked. On cross-examination, Springs testified that there were no sales records prior to 1977. For those sales occurring after 1977, John Crane, however, did sell products to Zenith, Standard Brands, and the City of Chicago but not to the exact locations where O'Reilly worked.

¶ 21    Dr. James Crapo testified on behalf of John Crane as an expert in the field of internal medicine, pulmonary medicine, and inhalation toxicology as it relates to asbestos. Dr. Crapo reviewed O'Reilly's medical records, work history, the operative complaint, his answers to interrogatories, and his two depositions. According to Dr. Crapo, the amount of exposure to asbestos or "dose" is most important in determining the cause of mesothelioma. For example, one must be exposed to a high dose of asbestos over decades to develop asbestos disease. Dr. Crapo opined that O'Reilly's mesothelioma was caused by his exposure to amosite asbestos from insulation. Dr. Crapo further opined that the chrysotile asbestos found in John Crane products would not have produced a high enough dose to cause O'Reilly's mesothelioma. Dr. Crapo made clear that the sole cause of O'Reilly's disease was due to his exposure to asbestos dust from insulation.

¶ 22    On cross-examination, Dr. Crapo admitted that an individual could acquire mesothelioma from exposure to any type of asbestos. When confronted with numerous publications and articles attributing chrysotile asbestos exposure to the development of mesothelioma, Dr. Crapo disagreed with the conclusions stated in those publications. Dr. Crapo further testified that none of the government organizations, such as OSHA, have stated there is a safe dose of chrysotile asbestos.

¶ 23    Dr. Amy Madl, a board certified toxicologist, testified as an expert on behalf of defendant. Dr. Madl authored a 2006-peer reviewed paper in which she concluded that exposure to gasket and packing materials produces very low concentrations of asbestos that do not increase the risk of any disease. Dr. Madl opined that O'Reilly's work with gaskets and packing did not increase his risk of developing an asbestos-related disease but in fact it was his work around asbestos insulation that increased his risk of developing mesothelioma.

¶ 24    At the close of evidence, the trial court conducted a jury instructions conference outside the presence of the jury. Specifically at issue in this appeal are the instructions surrounding proximate causation and a definition of "state of the art." Plaintiff presented the standard Illinois Pattern Jury Instruction for proximate cause (Illinois Pattern Jury Instructions, Civil, No. 15.01 (2006) (hereinafter IPI Civil (2006) No. 15.01). John Crane objected and presented its own instructions regarding proximate cause. The trial court rejected defendant's nonpattern instruction. John Crane also tendered a nonpattern instruction defining state of the art, which the trial court also rejected. Over plaintiff's objection, the trial court granted defendant's request for a sole proximate cause instruction (IPI Civil (2006) No. 12.05).

¶ 25    John Crane then requested that the proposed verdict form ask the jury to apportion fault between it and settled defendants Westinghouse and General Electric Company (General Electric). The trial court denied the request because it had previously granted Westinghouse's motion for a finding of good faith settlement over defendant's objection and General Electric had settled. Indeed, the trial court had, three months prior to trial, entered an order regarding General Electric's dismissal in the case.

¶ 26    After closing arguments, the jury deliberated and ultimately found in favor of plaintiff and against John Crane in the amount of $6,022,814.06. The trial court requested affidavits as to the settlement amounts of the other defendants so as to provide for a setoff. Plaintiff produced a single affidavit in which the total of the settlement was disclosed in the amount of $1,137,500. The trial court entered judgment on the verdict, including the amount of the setoff.

¶ 27    John Crane filed its posttrial motion arguing, in pertinent part, that the trial court erred when it (1) allowed Dr. Abraham to testify that the "cumulative dose" of O'Reilly's exposure to all asbestos products caused his injuries, (2) ignored Illinois precedent establishing that in an asbestos case any instruction on proximate cause must include the term "substantial factor" in its definition, (3) failed to instruct the jury as to the state of the art for asbestos gaskets and packing at the time of plaintiff's exposure, (4) did not include the other settled defendants on the verdict form, and (5) failed to properly analyze the settlement agreements with Westinghouse, Crane Co., Trane, and Weil-McLain before entering its good faith finding. The trial court denied the posttrial motion, finding the jury was properly instructed and that Dr. Abraham's testimony had been properly disclosed. This appeal followed.

¶ 28                                    ANALYSIS

¶ 29    On appeal, John Crane contends that the trial court erred in denying its posttrial motion because it (1) allowed one of plaintiff's medical experts to improperly testify that the "cumulative dose" of O'Reilly's exposure to all asbestos products caused his injuries, (2) provided inaccurate instructions to the jury regarding proximate cause and the state of the art in asbestos cases, (3) failed to include four settled defendants on the jury verdict form, and (4) did not properly analyze certain settlement agreements prior to entering findings of good

faith. We address each issue in turn.

¶ 30                                    Expert Testimony

¶ 31        Defendant first maintains that the trial court erred by allowing Dr. Abraham to testify that any exposure to John Crane products would have causally contributed to O'Reilly's asbestos related disease. John Crane asserts that this testimony should have been precluded because it is insufficient to establish substantial causation under Illinois law's "frequency, regularity, and proximity" standard and also runs counter to authority holding that "cumulative dose" causation testimony is insufficient to establish causation in an asbestos exposure case.

¶ 32        In response, plaintiff asserts that defendant forfeited its claim that Dr. Abraham's cumulative causation testimony was improper because defendant withdrew his objection to this testimony prior to trial. Forfeiture aside, plaintiff maintains that the trial court properly admitted the causation testimony where Dr. Abraham testified he reviewed O'Reilly's work history and deposition testimony and confirmed that O'Reilly's work history was central to his causation analysis.

¶ 33                                    *Forfeiture*

¶ 34        Prior to addressing the merits of John Crane's claim, we will consider plaintiff's forfeiture argument. Our review of the record reveals that while John Crane did initially withdraw its objection to the causation testimony of Dr. Abraham, this objection was renewed during trial. The trial court specifically considered and rejected John Crane's argument that Dr. Abraham's "every exposure testimony" be excluded. This argument was thereafter included in John Crane's posttrial motion. Accordingly, we find John Crane did not forfeit this argument, and we now turn to consider its merits.

¶ 35                                    *Admissibility*

¶ 36        The decision of whether to admit expert testimony is within the sound discretion of the trial court, and a ruling will not be reversed absent an abuse of that discretion. *Snelson v. Kamm*, 204 Ill. 2d 1, 24 (2003). "The abuse of discretion standard is the most deferential standard of review available with the exception of no review at all." (Internal quotation marks omitted.) *Davis v. Kraff*, 405 Ill. App. 3d 20, 28 (2010) (quoting *People v. Coleman*, 183 Ill. 2d 366, 387 (1998), quoting Martha S. Davis, *A Basic Guide to Standards of Judicial Review*, 33 S.D. L. Rev. 469, 480 (1988)). "An abuse of discretion occurs where no reasonable person would agree with the position adopted by the trial court." *Schwartz v. Cortelloni*, 177 Ill. 2d 166, 176 (1997). Thus, a "trial court cannot be said to have abused its discretion if reasonable persons could differ as to its decision." *In re Adoption of D.*, 317 Ill. App. 3d 155, 160 (2000).

¶ 37        John Crane relies primarily on *Krik v. Exxon Mobil Corp.*, 870 F.3d 669 (7th Cir. 2017), to support its argument that Dr. Abraham was improperly allowed to offer "cumulative" causation testimony. In *Krik*, the plaintiff alleged he contracted lung cancer due to his exposure to asbestos fibers either onboard a navy vessel from 1954 until 1960 or when he worked as an independent contractor at Exxon Mobil's refinery for two weeks replacing asbestos insulated heaters. *Id.* at 671-72. The plaintiff, however, also smoked a pack-and-a-half of cigarettes every day for 30 years. *Id.* at 671. Prior to trial, the defendants filed motions seeking to exclude the plaintiff's expert and other witnesses from testifying about a causation theory "often

referred to as 'each and every exposure theory,' 'any exposure theory,' 'the single fiber theory,' or 'no safe level of exposure theory.' " *Id.* at 672. These theories posited that "any exposure to asbestos fibers whatsoever, regardless of the amount of fibers or length of exposure constitutes an underlying cause of injury to the exposed individual." *Id.* After hearing argument, the trial court precluded the plaintiff from offering any expert testimony espousing such a theory at trial because the plaintiff had not established that the "any exposure" theory was sufficiently reliable to warrant admission under Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). *Krik*, 870 F.3d at 672.

¶ 38 Before trial commenced, the matter was transferred to another judge. Despite the prior ruling, the plaintiff called his expert to trial "hoping that a newly packaged 'cumulative exposure theory' would skirt [the prior judge's] earlier ruling on the motion *in limine*." *Id.* During *voir dire*, the expert testified that " 'if there is exposure to a cancer causing agent, that becomes part of the totality of the exposure. Some may contribute more, some may contribute less, but they are all part of the exposure.' " *Id.* at 673. The new judge, however, concluded that this "cumulative exposure" testimony was no different than the testimony proffered under the "each and every exposure" theory and did not allow the expert to so testify. *Id.* After a trial, the jury ultimately determined the plaintiff's lung cancer was caused by smoking and thus found in favor of the defendants. *Id.* at 672.

¶ 39 Through the lens of Federal Rule of Evidence 702 and *Daubert*, which requires that the expert testimony must be "ground[ed] in the methods and procedures of science" and "assist the trier of fact to understand or determine a fact in issue" (internal quotation marks omitted) (*Daubert*, 509 U.S. at 590-91), the Seventh Circuit concluded that the district court did not abuse its discretion by excluding the "cumulative/'any exposure' " testimony. *Krik*, 870 F.3d at 678.[6]

¶ 40 We initially observe that *Krik* is a federal court decision and is thus not binding precedent on this court. *Bahus v. Union Pacific R.R. Co.*, 2019 IL App (1st) 180722, ¶ 62. We may, however, find federal cases persuasive unless they run contrary to previously decided state cases. See *Falk v. Northern Trust Co.*, 327 Ill. App. 3d 101, 108 (2001). In this instance, we do not find *Krik* to be applicable to the facts in this case and thus find it unpersuasive. In *Krik*, regardless of whether the "each and every exposure" theory and "cumulative exposure" theory were the same, the plaintiff did not plan to offer "any evidence about how much asbestos exposure Krik experienced and whether that dosage could have been a substantial contributing factor to lung cancer." *Krik*, 870 F.3d at 675. The Seventh Circuit emphasized that in order for the plaintiff to demonstrate that asbestos exposure was a substantial contributing factor to the plaintiff's injury, he needed to introduce evidence of dosage, which necessarily includes evidence regarding the timing and amount of the plaintiff's exposure to asbestos. *Id.* at 674. It was not enough for the plaintiff's witnesses to posit that "each and every exposure to asbestos, including the first exposure, no matter how *de minimis*, 'is a substantial contribution to the cumulative total.' " *Id.* 674-75 (quoting *Krik v. Exxon Mobil Corp.*, 76 F. Supp. 3d 747, 753

---

[6]We note that while the federal courts use the *Daubert* standard, Illinois courts employ the *Frye* standard, which dictates that "scientific evidence is admissible at trial only if the methodology or scientific principle upon which the opinion is based is 'sufficiently established to have gained general acceptance in the particular field in which it belongs.' " *In re Commitment of Simons*, 213 Ill. 2d 523, 529-30 (2004) (quoting *Frye v. United States*, 293 F. 1013, 1014 (D.C. Cir. 1923)).

(N.D. Ill. 2014)). The Seventh Circuit concluded that the law of causation requires the plaintiff to prove that the defendants' acts or products were a substantial contributing factor to the plaintiff's illness. "De minimis exposure is not sufficient." *Id.* at 675 (citing *Krik*, 76 F. Supp. 3d at 753).

¶ 41    In contrast, plaintiff here did not rely solely on a cumulative exposure theory to establish causation, and when his testimony is read in its totality, Dr. Abraham did not testify as John Crane suggests. Dr. Abraham's testimony commenced with a general discussion of human anatomy and how asbestos-related diseases develop in the body. Dr. Abraham then testified that asbestos-related diseases are a "dose-response" disease. Dr. Abraham explained that this means "the more exposure someone has, the more likely they are to get it." He later expanded on this concept, stating that "[i]f something has a dose-response relationship, that means the chances of getting the disease or the response or the severity of the disease increase from no disease with no exposure to some amount, small exposure, more exposure, and then most with the heaviest exposures." In regards to asbestos-related diseases, "the chances of getting it go up with exposure and the severity [of the disease] go[es] up with exposure." Dr. Abraham did not testify, as did the expert in *Krik*, that even a *de minimis* exposure to asbestos could cause an asbestos-related disease. To the contrary, Dr. Abraham consistently testified that the more an individual is historically exposed to asbestos the more likely it is this person would develop an asbestos-related disease. Dr. Abraham's testimony stressed the importance of understanding the dose of asbestos fibers to which the individual was exposed in determining causation.

¶ 42    Furthermore, unlike the plaintiff in *Krik*, plaintiff in the case at bar did establish the dose of asbestos fibers O'Reilly was exposed to from the John Crane products. Ewing, the certified industrial hygienist, opined that the range of asbestos fibers O'Reilly would have been exposed to through the removal and installation of John Crane gaskets was 0.5 to 1 fibers per cubic centimeter. He further opined that the range of asbestos fibers O'Reilly would have been exposed to through the removal of John Crane packing was 0.5 to 2 fibers per cubic centimeter. Ewing testified to a reasonable degree of scientific certainty that when working with John Crane products O'Reilly was exposed to asbestos at levels above background and that those levels represented a "significant increase in exposure."

¶ 43    In sum, our review of the record does not reveal that Dr. Abraham presented a "cumulative exposure" theory similar to the one presented in *Krik*. Dr. Abraham's testimony provided the background knowledge the jury required to interpret Ewing's opinions regarding the cause of O'Reilly's malignant pleural mesothelioma. Plaintiff did not solely rely on Dr. Abraham's testimony to prove causation. Indeed, plaintiff proved causation as contemplated by the Seventh Circuit in *Krik*, through Ewing's testimony regarding the length of time O'Reilly was exposed to asbestos (1957-85) and the amount of asbestos to which he was exposed (ranging from 0.5 to 2 fibers per cubic centimeter). See *id.* We thus find the trial court did not abuse its discretion in permitting Dr. Abraham to testify.

¶ 44                                        Jury Instructions

¶ 45    John Crane next raises two claims of error in regard to the jury instructions. First, John Crane argues that the trial court erred in its proximate cause jury instruction where it did not instruct the jury that O'Reilly's exposure to John Crane products must be a substantial factor in bringing about his illness. Second, John Crane asserts that the trial court erred in refusing to

instruct the jury with its definition of "state of the art." We address each claim in turn.

¶ 46                                    *Standard of Review*

¶ 47        In this case, the trial court instructed the jury on proximate cause using IPI Civil (2006) Nos. 15.01 and 12.05. Our case law is clear that whenever an IPI instruction is applicable in a civil case, the trial court, giving due consideration to the facts and the prevailing law, is required to use that instruction. *Hobart v. Shin*, 185 Ill. 2d 283, 294 (1998); Ill. S. Ct. R. 239 (eff. Apr. 8, 2013) (the applicable civil IPI instructions shall be given unless the court determines that they do not accurately state the law). If the IPI instruction is inadequate, an additional instruction is appropriate. *Balestri v. Terminal Freight Cooperative Ass'n*, 76 Ill. 2d 451, 454-55 (1979); Ill. S. Ct. R. 239 (eff. Apr. 8, 2013) (an impartial non-IPI instruction may be given if the IPI instruction does not accurately state the law or does not cover a subject on which the jury should be instructed). The determination of whether an instruction is applicable and accurately states the law in a given case is within the trial court's discretion. *Hobart*, 185 Ill. 2d at 294. A reviewing court will not disturb the trial court's decision absent a clear abuse of that discretion. *Linn v. Damilano*, 303 Ill. App. 3d 600, 606-07 (1999). "The standard for determining an abuse of discretion is whether, taken as a whole, the instructions are sufficiently clear so as not to mislead and whether they fairly and correctly state the law." *Dillon v. Evanston Hospital*, 199 Ill. 2d 483, 505 (2002). We will not reverse a trial court for giving faulty instructions unless they clearly misled the jury and resulted in prejudice to the appellant. *Villa v. Crown Cork & Seal Co.*, 202 Ill. App. 3d 1082, 1088 (1990).

¶ 48                              *Substantial Factor Causation*

¶ 49        John Crane maintains that the trial court erred in denying its tendered nonpattern jury instructions Nos. 4 and 5, which it maintains accurately instructed the jury regarding the "substantial factor" requirement of proximate cause in asbestos cases. John Crane contends that under *Nolan v. Weil-McLain*, 233 Ill. 2d 416 (2009), *Thacker*, 151 Ill. 2d 343, and *First Springfield Bank & Trust v. Galman*, 188 Ill. 2d 252 (1999), that the substantial factor test properly states Illinois law in cases involving multiple causative agents. John Crane concludes that the trial court's refusal to give its tendered instructions Nos. 4 and 5 was prejudicial because it took the ability to evaluate the proper causation standard away from the jury and improperly affected the outcome of the case.

¶ 50        In response, plaintiff argues that these cases do not support John Crane's claims and maintains that the trial court provided the correct instructions where John Crane's nonpattern instructions did not accurately state the law.

¶ 51        John Crane's tendered instruction No. 4 provided as follows:

> "When I use the expression 'proximate cause,' I mean a cause that, in the natural or ordinary course of events, produced the plaintiff's injury. In an action regarding exposure to asbestos, in order to be considered a 'proximate cause' to an injury, the exposure to a defendant's products must be a substantial factor in the development of their asbestos disease."

Instead, the trial court provided IPI Civil (2006) No. 15.01, which states:

> "When I use the expression 'proximate cause,' I mean a cause that, in the natural or ordinary course of events, produced Patrick O'Reilly's injury. It need not be the only

cause, nor the last or nearest cause. It is sufficient if it combines with another cause resulting in the injury."

Over plaintiff's objection, the trial court also tendered IPI Civil (2006) No. 12.05, the sole proximate cause instruction, to the jury:

"If you decide that the defendant was negligent and that his negligence was a proximate cause of injury to Patrick O'Reilly, it is not a defense that something else may also have been a cause of the injury.

However, if you decide that the sole proximate cause of injury to the plaintiff was something other than the conduct of the defendant, then your verdict should be for the defendant."

¶ 52    We initially observe that none of the cases relied upon by John Crane find that a jury hearing an asbestos case must be instructed on the substantial factor test. First and foremost, *First Springfield Bank* is not an asbestos case, and John Crane's reliance on it is thus misplaced. Furthermore, while *Thacker* and *Nolan* involved injuries due to asbestos exposure, those opinions considered the substantial factor test as it related to the trial court's determinations on a motion for a judgment *n.o.v.* and a motion *in limine*, respectively. Specifically, in *Thacker*, the plaintiff brought suit against several defendants seeking damages for her husband's injuries and death from lung cancer, which she claimed he contracted while working with their asbestos-containing products. *Thacker*, 151 Ill. 2d at 349. The jury found for plaintiff, and on appeal, our supreme court considered whether the trial court erred in denying a defense motion for judgment *n.o.v.* because the plaintiff failed to produce sufficient evidence of exposure to defendants' asbestos. The defendants maintained that their products comprised a small amount of the decedent's total asbestos exposure relative to the large amount of exposure he experienced from other sources, and that the jury's verdict was unsupportable because it was forced to improperly speculate regarding the cause of his injuries. *Id.* at 355. The plaintiff countered that she met her burden by demonstrating that the defendants' asbestos circulated in the air that the decedent breathed and, in light of medical testimony that only slight exposure could cause his illness, the jury's award was justified. *Id.* at 355-56.

¶ 53    Our supreme court found that the circuit court correctly denied the defense motion for judgment *n.o.v. Id.* at 364. In so finding, the court adopted the "frequency, regularity and proximity test" to determine whether sufficient evidence of cause in fact had been presented by the plaintiff to allow the case to go to the jury. *Id.* at 359. The court explained that in order to have the question of legal causation submitted to the jury, the plaintiff must first demonstrate that the injured worker "was exposed to the defendant's asbestos through proof that (1) he regularly worked in an area where the defendant's asbestos was frequently used and (2) the injured worker did, in fact, work sufficiently close to this area so as to come into contact with the defendant's product." *Id.* The court concluded that the plaintiff had satisfied the frequency, regularity, and proximity test to withstand a directed verdict and allow the issue of legal causation to be submitted to the jury. *Id.* at 366. Because the court further determined that the jury's ultimate ruling in favor of plaintiff was supportable based upon the totality of the evidence presented, our supreme court found no error in the trial court's denial of the defendants' motion for judgment *n.o.v. Id.*

¶ 54    *Nolan* involved a similar factual scenario. In that case, the plaintiff sought recovery against 12 corporations, including the defendant Weil-McLain, alleging that her husband developed mesothelioma after being negligently exposed to the defendants' asbestos containing products.

- 12 -

*Nolan*, 233 Ill. 2d at 419. The 11 other defendants settled or were dismissed prior to trial, leaving only Weil-McLain. *Id.* In its motion *in limine*, Weil-McLain sought to present evidence that the sole proximate cause of the decedent's death was his exposure to asbestos-containing products of nonparty entities. *Id.* The plaintiff also filed a motion *in limine* seeking to bar all evidence of the decedent's exposure to asbestos products of nonparties as irrelevant and confusing to the jury. *Id.* at 420. The trial court granted the plaintiff's motion *in limine* and barred the defendant from introducing evidence of the decedent's other asbestos exposures. *Id.* at 421.

¶ 55    After a jury found in favor of the plaintiff, the defendant appealed, arguing the trial court erred by excluding evidence of the decedent's other exposures to asbestos. *Id.* at 427. A majority of the appellate court affirmed the trial court holding that " '[o]nce a plaintiff satisfies the [frequency, regularity, and proximity] *Thacker* test, a defendant is presumed to be a proximate cause of a decedent's asbestos injury.' " *Id.* (quoting *Nolan v. Weil-McLain*, 365 Ill. App. 3d 963, 968 (2006)). Our supreme court, however, disagreed with the appellate court (which based its reasoning on other appellate court cases that misinterpreted *Thacker*) and found that "when correctly viewed, *Thacker* provides a means for determining whether a plaintiff in an asbestos case has presented sufficient evidence to establish cause in fact and, thereby, shift the *burden of production* to the defendant." (Emphasis in original.) *Id.* at 434-35. The court reiterated, that "the ultimate *burden of proof on the element of causation* remains exclusively on the plaintiff, and that burden is never shifted to the defendant." (Emphasis in original.) *Id.* at 435. Ultimately, our supreme court concluded that the trial court erred in excluding other-exposure evidence and that the error was not harmless because, "[o]ur case law—properly interpreted—stands for the proposition that the jury must be allowed to sort through competent—and likely conflicting—evidence so that it can fairly resolve whether exposure to a particular product was the proximate cause of injury." *Id.* at 445.

¶ 56    We observe that unlike the trial court in *Nolan*, the trial court here specifically allowed John Crane to present evidence regarding O'Reilly's exposure to other asbestos products manufactured by nonparty entities. The trial court here also properly allowed, over plaintiff's objection, IPI Civil (2006) No. 12.05, which set forth the sole proximate cause defense argued by John Crane.

¶ 57    Indeed *Thacker*, *Nolan*, and *First Springfield Bank* are relevant to this discussion only insofar as they set forth the general case law regarding proximate causation in Illinois. These cases explain that the plaintiff bears the burden of producing evidence sufficient to establish each element of the claim. This burden of production is met " 'when there is some evidence which, when viewed most favorably to the plaintiff's position, would allow a reasonable trier of fact to conclude the element to be proven.' " *Nolan*, 233 Ill. 2d at 430 (quoting *Thacker*, 151 Ill. 2d at 354). The term proximate cause describes two distinct requirements: cause in fact and legal cause. Cause in fact exists where there is a reasonable certainty that a defendant's acts caused the injury or damage. Generally, there are two tests used by courts when considering cause in fact. Under the traditional "but for" test, a defendant's conduct is not a cause of an event if the event would have occurred without it. Under the "substantial factor" test, which has been adopted by the Restatement (Second) of Torts (1965), the defendant's conduct is said to be a cause of an event if it was a material element and a substantial factor in bringing the event about. In contrast, "legal cause" is essentially a question of foreseeability. *Thacker*, 151 Ill. 2d. at 354; *Nolan*, 233 Ill. 2d at 430-31; *First Springfield Bank*, 188 Ill. 2d at 257-58.

¶ 58    Because the plaintiffs in *Thacker*, *Nolan*, and *First Springfield Bank* chose to prove that their respective defendants were a cause in fact of the injuries through the substantial factor test, the cases went on to describe what the substantial factor test entails. Specifically, our supreme court explained that the substantial factor test requires that the alleged tortfeasor's conduct be somehow responsible for producing the injury at issue. *Thacker*, 151 Ill. 2d at 355.

¶ 59    To meet this burden of production in asbestos cases, our supreme court utilized the "frequency, regularity, and proximity" test as a means by which an asbestos plaintiff can prove more than minimum contact with a defendant's product to establish that a specific defendant's product was a substantial factor in being a cause in fact of a plaintiff's injury. *Id.* at 359; *Nolan*, 233 Ill. 2d at 432.

¶ 60    We find no error in the jury instructions provided regarding proximate cause. Illinois Supreme Court Rule 239(a) (eff. Apr. 8, 2013) requires that "[w]henever Illinois Pattern Jury Instructions (IPI), Civil, contains an instruction applicable in a civil case, giving due consideration to the facts and the prevailing law, and the court determines that the jury should be instructed on the subject, the IPI instruction shall be used, unless the court determines that it does not accurately state the law." Here, IPI Civil (2006) No. 15.01, in conjunction with IPI Civil (2006) No. 12.05, accurately stated the law as it related to the case. None of the case law presented by John Crane supports the conclusion that an asbestos jury must be instructed on the substantial factor test.

¶ 61    Moreover, John Crane's nonpattern instruction No. 4 does not accurately state the law of this case. The trial court approved the long form of IPI Civil (2006) No. 15.01, which includes a discussion of concurrent causation, plaintiff's theory of causation. John Crane's nonpattern instruction No. 4 removed from the jury instruction the following language, "It need not be the only cause, nor the last or nearest cause. It is sufficient if it combines with another cause resulting in the injury." John Crane proposed to replace this language with, "In an action regarding exposure to asbestos, in order to be considered a 'proximate cause' to an injury, the exposure to a defendant's products must be a substantial factor in the development of their asbestos disease." The "Notes on Use" for IPI Civil (2006) No. 15.01 state that, "[t]his instruction in its entirety should be used when there is evidence of a concurring or contributing cause to the injury or death." IPI Civil (2006) No. 15.01, Notes on Use. Here, the evidence demonstrated that O'Reilly was exposed to multiple asbestos-containing products, including those of John Crane, and therefore the long-form instruction was appropriate. We therefore conclude that the language of nonpattern instruction No. 4 does not adequately convey the concept of concurrent causation and the trial court properly declined to accept it as part of the jury instruction. See *Skonberg v. Owens-Corning Fiberglas Corp.*, 215 Ill. App. 3d 735, 748-49 (1991) (an inaccurate statement of law is sufficient to allow the trial court to reject the entire instruction).

¶ 62    John Crane further argues that the trial court's refusal to provide nonpattern instruction No. 4 allowed the jury to find against John Crane even if O'Reilly's exposures to its products were not "material" or "substantial" among his "overwhelming exposures to amosite asbestos contained in the large volume of friable insulation to which he was exposed during his career." Plaintiff responds, arguing that had the trial court delivered John Crane's instruction No. 4 to the jury, the phrase "substantial factor" would have focused the jury's attention on quantity alone, ignoring the "frequency, regularity, and proximity" test and the testimony that even seemingly insubstantial quantities could satisfy proximate cause.

- 14 -

¶ 63        On this point, we find *Johnson v. Owens-Corning Fiberglas Corp.*, 313 Ill. App. 3d 230 (2000), to be instructive. While *Johnson* did not involve jury instructions including the term "substantial factor," we find the logic it employs applicable to the case at bar. In *Johnson*, the plaintiff filed a complaint against numerous defendants alleging that her husband died as a result of exposure to various asbestos-containing products. *Id.* at 232. At the conclusion of her case-in-chief, the trial court directed a verdict in the favor of certain defendants, and ultimately the jury returned a verdict in favor of the remaining defendant. *Id.* On appeal, the plaintiff argued, in pertinent part, that the trial court erred in giving the jury two special interrogatories requested by one of the defendants. *Id.* at 236. Pertinent to this case, the *Johnson* plaintiff challenged the instruction where the jury was asked:

> " 'Did Charles Johnson regularly work in an area where [defendant's] asbestos-containing products were frequently used so as to be exposed to asbestos fibers from the defendant's products?' " *Id.*

The reviewing court concluded that the special interrogatory was not in proper form and should not have been given to the jury. *Id.* at 237. The court explained:

> "Injecting the terms 'frequently' and 'regularly' into the jury's deliberations without further explanation carries with it the danger that jurors may interpret their instructions to mean that a plaintiff must prove that he was exposed to a substantial number of the defendant's asbestos fibers. In actuality, the substantial-factor test is not concerned with the quantity of asbestos but its legal significance. [Citation.] Where there is competent evidence that one or a *de minimis* number of asbestos fibers can cause injury, a jury may conclude the fibers were a substantial factor causing a plaintiff's injury. [Citation.]" *Id.* at 237-38 (citing *Wehmeier v. UNR Industries, Inc.*, 213 Ill. App. 3d 6, 31 (1991)).

The court continued to state that without explanation or context the frequency, regularity, and proximity test is a likely source of confusion and misapprehension for the jury. *Id.* at 238.

¶ 64        As in *Johnson*, we find that the trial court here correctly declined to provide John Crane's instruction No. 4 where the term "substantial" in the asbestos context could be misconstrued by the jury as requiring a specific quantity of asbestos exposure. As previously stated, "[t]he substantial factor test is not concerned with the *quantity* of the injury-producing agent or force but rather with its *legal significance*." (Emphases in original.) *Wehmeier*, 213 Ill. App. 3d at 31.

¶ 65        This brings us to John Crane's next argument that the trial court erred in failing to provide the jury with its proposed instruction defining the term "substantial factor." We find that using the term "substantial factor" in the jury instruction as proposed by John Crane would have further perpetuated error where John Crane's nonpattern jury instruction No. 5 did not accurately state the law. It read as follows:

> "A defendant's conduct is a material element and a substantial factor in bringing about an injury *if, absent that conduct, the injury would not have occurred*." (Emphasis added.)

This instruction misstates the law because it conflates the two methods by which a plaintiff may prove causation in fact. As previously explained, a plaintiff may elect to prove cause in fact one of two ways, through (1) the traditional "but for" test, where "a defendant's conduct is not a cause of an event if the event would have occurred without it," or (2) the substantial

- 15 -

factor test, where "the defendant's conduct is said to be the cause of an event if it was a material element and a substantial factor in bringing the event about." *Thacker*, 151 Ill. 2d at 354-55; *Nolan*, 233 Ill. 2d at 431. Here, plaintiff chose to proceed via the latter. John Crane's proposed jury instruction, however, includes the "but for" test as it states that "absent [the defendant's] conduct, the injury would not have occurred." This is an incorrect statement of the law and the plaintiff's theory of causation; therefore, the trial court properly declined to provide John Crane's nonpattern instruction to the jury.

¶ 66 In sum, we conclude that the trial court correctly instructed the jury with the applicable IPI instructions. We further conclude that the nonpattern instructions proposed by John Crane did not accurately state the law and thus were properly excluded by the trial court.

¶ 67 *State of the Art*

¶ 68 John Crane next asserts that the trial court erred when it failed to accept its nonpattern jury instruction No. 6 on the state of the art. John Crane maintains that the recent case of *McKinney v. Hobart Brothers Co.*, 2018 IL App (4th) 170333, explains that in an asbestos case the existence of a duty to warn depends on whether, at the time of the exposure, knowledge existed in the industry of the dangerous propensity of the manufacturer's product. Accordingly, John Crane contends that the trial court erred when it failed to so instruct the jury.

¶ 69 Plaintiff responds that nonpattern jury instruction No. 6 failed to fairly instruct the jury on the question of duty by insinuating that a plaintiff must prove industry knowledge rather than the defendant's own knowledge. Plaintiff asserts that she presented sufficient evidence that John Crane itself had knowledge of the dangers of asbestos and therefore the trial court correctly rejected John Crane's proposed instruction.

¶ 70 In reply, John Crane argues that there was no evidence presented that it knew its encapsulated gaskets and packing were hazardous to O'Reilly and therefore plaintiff had to rely on what John Crane should have known, which is determined by industry knowledge, *i.e.*, the state of the art.

¶ 71 Before we specifically address John Crane's nonpattern jury instruction No. 6, it is helpful to review the law surrounding the negligent failure to warn, the theory under which plaintiff set forth her case before the jury. Negligence concerns injuries arising from a defendant's breach of the duty of reasonable care (*Ward v. K Mart Corp.*, 136 Ill. 2d 132, 140 (1990)) and focuses on the particular defendant's knowledge and conduct (*Woodill v. Parke Davis & Co.*, 79 Ill. 2d 26, 33-34 (1980)). "A plaintiff who seeks to recover from a manufacturer for failure to warn users of the dangers of a product must show that 'the defendant manufacturer knew or should have known of the danger that caused the injury, and that the defendant manufacturer failed to warn plaintiff of that danger.' " *Startley v. Welco Manufacturing Co.*, 2017 IL App (1st) 153649, ¶ 43 (quoting *Woodill*, 79 Ill. 2d at 35); see *Kurrack v. American District Telegraph Co.*, 252 Ill. App. 3d 885, 893 (1993) (finding it "was encumbent upon plaintiff to plead and prove that [the defendant] knew or should have known that the *** asbestos-containing material used as insulation in its alarm system, posed a danger").

¶ 72 Here, John Crane's nonpattern jury instruction No. 6 provided:

"The State of the Art is whether the defendant[ ] knew or should have known of the danger presented by the use or consumption of a product. Once it is established that knowledge existed in the industry of the dangerous propensity of the defendant's

- 16 -

product, then the plaintiff must establish that the defendant did not warn, in an adequate manner, of the danger."

This instruction is confusing and misleading, as it appears to require plaintiff to prove that both John Crane and those in the asbestos products manufacturing industry knew of the dangerous nature of John Crane's gaskets and packing. This is not the law in Illinois. "A duty to warn of a particular hazard will be imposed only where there is unequal knowledge, either actual or constructive, and *the defendant* knows or should know that injury may occur if no warning is given." (Emphasis added.) *Carrizales v. Rheem Manufacturing Co.*, 226 Ill. App. 3d 20, 25 (1991). Evidence of industry standards, *i.e.*, state of the art, may be presented as an aid to the jury in determining the feasible practices and what defendant knew or should have known. See *Bishop v. Crowther*, 92 Ill. App. 3d 1, 13 (1980); *McKinney*, 2018 IL App (4th) 170333, ¶ 59. But state of the art evidence is not wholly necessary where there is evidence that the defendant knew or should have known that the injury may occur if no warning is provided. See *Carrizales*, 226 Ill. App. 3d at 25.

¶ 73    In reaching this conclusion, we have considered *McKinney* and *Woodill*, as cited by John Crane, and find them distinguishable from the case at bar. John Crane essentially argues that *McKinney* and *Woodill* required the trial court to instruct the jury that "knowledge existed in the industry of the dangerous propensity of the defendant's product." We observe, however, that neither *McKinney* nor *Woodill* involved jury instructions on the state of the art. See *McKinney*, 2018 IL App (4th) 170333, ¶¶ 1-2 (considering whether the trial court should have granted the defendant's motion for judgment *n.o.v.* where there was no evidence presented that the defendant had knowledge in the 1960s that its welding rods could release asbestos fibers); *Woodill*, 79 Ill. 2d at 35 (considering whether the trial court correctly dismissed the plaintiffs' strict liability claim where they did not plead that "the defendant manufacturer knew or should have known of the danger that caused the injury and that the defendant manufacturer failed to warn plaintiff of that danger").

¶ 74    In *McKinney*, the plaintiff's theory of duty was that the defendant should have known of the danger based on what was known in the industry, *i.e.*, the state of the art. Because the trial court's determination on a motion for a judgment *n.o.v.* was at issue, the trial court evaluated the evidence presented and determined that the plaintiff did not establish that the industry knew in 1962 or 1963 that the defendant's products—welding rods consisting of encapsulated asbestos—posed a danger when manipulated as described by the plaintiff. The defendant's direct knowledge was not at issue. *McKinney*, 2018 IL App (4th) 170333, ¶ 44. Here, in contrast, there was testimony relating to John Crane's knowledge of the dangers of its products at the time O'Reilly was exposed. There was also testimony that O'Reilly used John Crane's products in a similar manner. Specifically, McKillop testified that John Crane was aware that end users used paint scrapers, wire brushes, and cutters to fit the gaskets and remove packing. Accordingly, *McKinney* is not applicable to the matter at bar.

¶ 75    In *Woodill*, our supreme court found that a knowledge requirement is a proper limitation to place on strict tort liability when the case is predicated on a failure to warn of danger inherent in the product. *Woodill*, 79 Ill. 2d at 35. Specifically, once it is established that knowledge existed in an industry of a dangerous propensity of the product, the plaintiff must demonstrate that the defendant did not warn of the danger in an adequate manner. The *Woodill* court reasoned that a manufacturer could not be held liable for failure to warn of a danger which it would be impossible to know based on existing knowledge. *Id.* at 37.

¶ 76 The testimony in this case, however, established that by 1970 John Crane was aware of the dangers of asbestos dust and, as previously discussed, that pipefitters manipulated John Crane's encapsulated asbestos products in a manner that produced dust. Accordingly, what was known in the industry is merely secondary to what was actually known by John Crane. Therefore, we find that the trial court did not err in failing to instruct the jury according to John Crane's nonpattern instruction No. 6. See *Hammond v. North American Asbestos Corp.*, 97 Ill. 2d 195, 208 (1983) (finding the evidence established that the defendant knew of the dangerous propensities of asbestos but chose not to warn of the hazard).

¶ 77                                         Jury Verdict Form

¶ 78 John Crane asserts that the trial court abused its discretion when it failed to include four defendants who settled before trial (Crown Cork & Seal, General Electric, Metropolitan Life Insurance Company, and Owens Illinois (herein "settled defendants")) on the jury verdict form. John Crane contends that under the Joint Tortfeasor Contribution Act (Contribution Act) (740 ILCS 100/1 *et seq.* (West 2018)), the jury is allowed to apportion liability among joint tortfeasors in accordance with each tortfeasor's relative culpability. John Crane requests this court reverse and remand for a new trial with instructions for the trial court to include all joint tortfeasors who have not entered into good faith settlements on the verdict form for an equitable apportionment of liability.

¶ 79 In response, plaintiff asserts that during the jury instructions conference John Crane requested that, of the settled defendants, only General Electric appear on the jury verdict form. Thus, any arguments made regarding the other settled defendants is forfeited. Regardless of any forfeiture, plaintiff maintains that the trial court properly excluded the settled defendants from the jury verdict form pursuant to *Ready v. United/Goedecke Services, Inc.*, 232 Ill. 2d 369 (2008).

¶ 80 In regard to the issue of forfeiture, we agree with plaintiff. The record reflects that John Crane did not attempt to include the three other settled defendants on the verdict form, and therefore any claims raised as to those settled defendants on appeal are forfeited. See *Marek v. Stepkowski*, 241 Ill. App. 3d 862, 870 (1992). Accordingly, we now turn to address whether settled defendant General Electric was properly excluded from the verdict form.

¶ 81 Analysis of the verdict form requires consideration of section 2-1117 of the Code of Civil Procedure (Code) (735 ILCS 5/2-1117 (West 2018)), which provides:

"Except as provided in Section 2-1118, in actions on account of bodily injury or death or physical damage to property, based on negligence, or product liability based on strict tort liability, all defendants found liable are jointly and severally liable for plaintiff's past and future medical and medically related expenses. Any defendant whose fault, as determined by the trier of fact, is less than 25% of the total fault attributable to the plaintiff, the defendants sued by the plaintiff, and any third party defendant except the plaintiff's employer, shall be severally liable for all other damages. Any defendant whose fault, as determined by the trier of fact, is 25% or greater of the total fault attributable to the plaintiff, the defendants sued by the plaintiff, and any third party defendants except the plaintiff's employer, shall be jointly and severally liable for all other damages."

Our standard of review of a trial court's decision relating to a jury verdict form is whether the trial court abused its discretion. *Werner v. Nebal*, 377 Ill. App. 3d 447, 457 (2007).

- 18 -

¶ 82    We find our supreme court's opinion in *Ready* to be dispositive. In *Ready*, the court considered whether settling tortfeasors were considered " 'defendants sued by the plaintiff' " within the meaning of section 2-1117. *Ready*, 232 Ill. 2d at 374 n.2 (quoting 735 ILCS 5/2-1117 (West 2004)). There, the plaintiff's husband was killed during a construction project and the plaintiff filed a wrongful-death suit against the building owner, her husband's employer; the general contractor; and a subcontractor on the project. *Id.* at 372. The building owner and the general contractor settled prior to trial, and a good faith finding was entered. *Id.* During trial, the subcontractor was not permitted to present any evidence as to the conduct of the settling defendants, and the settling defendants were not listed on the verdict form; the jury found the subcontractor liable for negligence, and the trial court found the subcontractor jointly and severally liable for the amount of the verdict remaining after offsets for the husband's comparative negligence and the settlement amounts paid by the settling defendants. *Id.* at 373.

¶ 83    On appeal, the subcontractor argued that the trial court erred by failing to include the settling defendants on the verdict form, claiming that if the jury had been able to consider their share of fault, the subcontractor's share may have been less than 25%, making the subcontractor only severally liable. *Id.* The appellate court agreed, concluding that, under section 2-1117, a nonsettling defendant's fault should be assessed relative to the fault of all defendants, including settling defendants, and, thus, the settling defendants should have been included on the verdict form for purposes of fault apportionment. *Id.* at 373-74.

¶ 84    The supreme court, however, after considering the language and history of the statute, found that settling defendants are not " 'defendants sued by the plaintiff' " within the meaning of section 2-1117, stating that "we disagree with the appellate court's holding that, under section 2-1117, a remaining defendant's culpability must be assessed relative to the culpability of all defendants, including settling defendants." *Id.* at 383.

¶ 85    John Crane maintains *Ready* is only applicable to defendants who settle in good faith. We disagree. While the trial court in *Ready* found the defendants' settlements to be reached in good faith, this fact was not considered in the reasoning of the court's opinion. The court defined the issue on appeal as being "whether section 2-1117 requires the inclusion of *settled and otherwise dismissed defendants* in the allocation of fault." (Emphasis added.) *Id.* at 377. Then, in analyzing section 2-1117, our supreme court used the broad, general term "settled defendants." The court did not reference the Contribution Act.

¶ 86    After finding the phrase " 'defendants sued by the plaintiff' " to be ambiguous, the court looked to other tools of interpretation to ascertain its meaning, including whether the legislature chose to not amend a statute after a judicial construction. *Id.* at 379-80. Our supreme court observed that in 1995 the appellate court held in *Blake v. Hy Ho Restaurant, Inc.*, 273 Ill. App. 3d 372 (1995), that under section 2-1117 settling defendants were not to be included in the apportionment of fault. Thereafter, "[t]he 2003 amendment to section 2-1117 did not deal with this prior holding in *Blake*." *Ready*, 232 Ill. 2d at 380. Thus, our supreme court concluded that the legislature's "failure to address *Blake*'s holding at that time is an indication of the legislature's acceptance, as of 2003, of this judicial interpretation of section 2-1117." *Id.* Interestingly, the reviewing court in *Blake* similarly discussed section 2-1117 in the general terms of a "settling defendant" or "settling tortfeasor" as did our supreme court in *Ready*. See *Blake*, 273 Ill. App. 3d at 375-76.

¶ 87    Our supreme court further acknowledged, as additional support for its conclusion, statements made by Illinois Senator John Cullerton during floor debate on Senate Bill 1296,

which was aimed at amending section 2-1117. See *Ready*, 232 Ill. 2d at 382. In those statements, "Senator Cullerton emphasized that Senate Bill 1296 was intended to clarify 'what the intent of the 1986 law was. *** It just makes it clear, if you settle with somebody, their names don't go on the verdict form.' " *Id.* at 383 (quoting 95th Ill. Gen. Assem., Senate Proceedings, Mar. 20, 2007, at 77 (statements of Senator Cullerton)). Again, the statements of Senator Cullerton also reflect the broad notion that section 2-1117 includes any settling defendant, not only those who settle in good faith. See *id.*

¶ 88      As observed by this court, "[a]fter the supreme court's 2008 decision in *Ready*, appellate courts and parties have uniformly interpreted *Ready* as preventing *settling defendants* from appearing on a verdict form." (Emphasis added.) *Ramirez v. FCL Builders, Inc.*, 2014 IL App (1st) 123663, ¶ 187 (citing *Miranda v. Walsh Group, Ltd.*, 2013 IL App (1st) 122674, ¶ 14, *Cellini v. Village of Gurnee*, 403 Ill. App. 3d 26, 37 (2010), and *Jablonski v. Ford Motor Co.*, 398 Ill. App. 3d 222, 271 (2010), *overruled on other grounds by* 2011 IL 110096). While *Miranda* and *Cellini* involved defendants who settled in good faith, this court's statement in *Ramirez* is correct; in discussing *Ready*, the *Miranda* and *Cellini* courts did not limit *Ready*'s holding only to those defendants who settled in good faith. See *Miranda*, 2013 IL App (1st) 122674, ¶ 14; *Cellini*, 403 Ill. App. 3d at 37.

¶ 89      In so finding, we acknowledge John Crane's argument that *Ready* applies only to those defendants who settle in good faith is premised on language set forth in the conclusion paragraph of the opinion wherein our supreme court stated, "[w]e hold that section 2-1117 does not apply to good-faith settling tortfeasors who have been dismissed from the lawsuit." *Ready*, 232 Ill. 2d at 385. Reading the conclusion paragraph as a whole, it is evident that in writing this phrase our supreme court was merely applying its general holding that "section 2-1117, as enacted in 1986, was never intended to include settling tortfeasors in the apportionment of fault" to the specific facts before it. *Id.* at 382. Accordingly, we conclude that the trial court did not abuse its discretion when it declined to adopt John Crane's verdict form that included General Electric, a settled defendant.

¶ 90      In reaching this conclusion, we observe that John Crane has not cited any case law wherein an Illinois court has held that settled defendants in asbestos litigation must be included on the jury verdict form. In addition, we have also considered the cases relied upon by John Crane, *Wilkerson v. Pittsburgh Corning Corp.*, 276 Ill. App. 3d 1023, 1033 (1995), and *Bowers v. Murphy & Miller, Inc.*, 272 Ill. App. 3d 606, 608 (1995), inapposite. John Crane cites *Wilkerson* to support its proposition that "juries are routinely allowed to apportion fault among all defendants who have not negotiated a good faith settlement." In *Wilkerson*, however, multiple defendants, having set forth counterclaims, went to trial and therefore those defendants were to be included on the jury verdict form. *Wilkerson*, 276 Ill. App. 3d at 1032. Accordingly, *Wilkerson* is not applicable in this instance. John Crane also asserts that *Bowers* provides that it "is the good faith finding that creates a right to a set-off for the jury's verdict and extinguishes a non-settling defendant's right to contribution from the settling tortfeasors; without such a finding, settling joint tortfeasors may still be assigned a percentage of liability at trial." We do not agree with John Crane's reading of *Bowers*. Nowhere in *Bowers* can this language be found. Indeed the *Bowers* court did not remotely consider whether settled defendants should appear on a jury verdict form but instead set forth the proper burden of proof when a nonsettling defendant seeks to challenge whether a particular settlement agreement was made in good faith. *Bowers*, 272 Ill. App. 3d at 610. For these reasons, we conclude that the

- 20 -

trial court did not abuse its discretion when it declined to accept John Crane's proposed jury verdict form.

¶ 91                                    Good Faith Settlement Findings

¶ 92    Lastly, John Crane argues that the trial court abused its discretion when it approved the good faith settlements of four defendants without knowing the amounts of the settlements or determining how those settlements would be allocated. Without knowing this information, John Crane asserts that the trial court could not determine whether the settlement amounts were within a reasonable range of the settling defendants' fair shares of liability.

¶ 93    In response, plaintiff maintains that there is no rule that sets forth that those who settle must reveal the amount of their settlement or their allocation terms to make a preliminary showing of good faith. Plaintiff further argues that any allocation term in any of the defendants' settlement agreements is immaterial to the good faith of the agreements because it could have no impact on the setoff John Crane would receive. In addition, plaintiff contends that the actual dollar amount of each settlement is not a sound basis on which to challenge a finding of good faith.

¶ 94    We initially observe that while the record does not indicate whether plaintiff provided the trial court with the specific amounts of each settlement and these amounts have never been provided to this court, we will still consider the issue. We thus begin with a recitation of the well-established law surrounding good faith findings under the Contribution Act (740 ILCS 100/1 *et seq.* (West 2018)). The Contribution Act creates a right of contribution in actions " 'where 2 or more persons are subject to liability in tort arising out of the same injury to person or property, or the same wrongful death' [citation], to the extent that a tortfeasor pays more than his *pro rata* share of the common liability." *Johnson v. United Airlines*, 203 Ill. 2d 121, 128 (2003). The Contribution Act also provides that a tortfeasor who settles in good faith with the injured party is discharged from contribution liability. 740 ILCS 100/2(c), (d) (West 2018). The Contribution Act seeks to promote two important public policies: encouraging settlements and ensuring the equitable apportionment of damages among tortfeasors. *Antonicelli v. Rodriguez*, 2018 IL 121943, ¶ 13.

¶ 95    "The 'good faith' of a settlement is the only limitation that the [Contribution] Act places on the right to settle and it is the good-faith nature of a settlement that extinguishes the contribution liability of the settling tortfeasor." *Johnson*, 203 Ill. 2d at 128; *Antonicelli*, 2018 IL 121943, ¶ 14. The Contribution Act does not define "good faith," nor does it provide any procedural guidelines as to when or how a good-faith determination is to be made. *Johnson*, 203 Ill. 2d at 128. When deciding whether a settlement was made in good faith, the settling parties carry the initial burden of making a preliminary showing of good faith. *Id.* at 132. At a minimum, the settling parties must establish the existence of a legally valid settlement agreement, although not all legally valid settlements satisfy the good-faith requirements of the Contribution Act and the court may need to consider other factual evidence before making its determination. *Id.* Once the settling parties make a preliminary showing of good faith, the party challenging the good faith of the settlement must prove the absence of good faith by a preponderance of the evidence. *Id.* When a court decides whether a settlement was negotiated in good faith, it must strike a balance between the two important public policies underlying the Contribution Act—the encouragement of settlements and the equitable apportionment of damages among tortfeasors. *Id.* at 133.

- 21 -

¶ 96    We review a trial court's decision to approve a settlement for an abuse of discretion (*id.* at 135; *Miranda*, 2013 IL App (1st) 122674, ¶ 10), which "is the most deferential standard of review—next to no review at all—and is therefore traditionally reserved for decisions made by a trial judge in overseeing his or her courtroom or in maintaining the progress of a trial." *In re D.T.*, 212 Ill. 2d 347, 356 (2004) (citing *Coleman*, 183 Ill. 2d at 387). A trial court abuses its discretion where its ruling is so arbitrary or illogical that no reasonable person would adopt it. *Id.*

¶ 97    We initially observe that John Crane is not arguing that the settlements were made in bad faith; rather John Crane argues that the trial court did not have enough facts before it to render an informed decision because the trial court did not consider the actual terms of the settlement agreements and their amounts.

¶ 98    In support of its position, John Crane relies on *Cianci v. Safeco Insurance Co. of Illinois*, 356 Ill. App. 3d 767 (2005). We find John Crane's reliance of *Cianci* in this regard to be unpersuasive. In *Cianci*, the plaintiffs filed a 14-count second amended complaint against three defendants, Safeco Insurance Company of Illinois (Safeco) (their home owners insurance company), American Cleaning Co. (American Cleaning) (a water damage remediation company), and Brouwer Brothers (a mold remediation company) under various theories of liability including negligence, intentional tortious conduct, and vicarious liability based on water damage sustained by their home that was not properly remediated. *Id.* at 771-72. Thereafter, Safeco and American Cleaning filed motions to transfer venue to Will County based on *forum non conveniens*. Brouwer Brothers joined in those motions. *Id.* at 772. Each of the defendants also filed separate motions to dismiss certain counts of the plaintiffs' complaint. *Id.* The circuit court denied Safeco's motion to dismiss and continued the motions to transfer venue. Shortly thereafter, Safeco and American Cleaning brought motions for a good faith finding pursuant to settlements they had reached with the plaintiffs. *Id.* at 772-73. Brouwer Brothers objected to these motions, but however, the circuit court found that the settlements were made in good faith. *Id.* at 773.

¶ 99    On appeal, Brouwer Brothers argued that the circuit court abused its discretion in finding the settlements between the plaintiffs and Safeco and American Cleaning were entered into in good faith where the circuit court failed to conduct an evidentiary hearing to evaluate the settlement and the method of apportionment of damages. *Id.* at 781. The reviewing court agreed that the circuit court abused its discretion when it failed to conduct an evidentiary hearing based on the specific facts in the case. *Id.* at 782-83. In finding the circuit court abused its discretion, the reviewing court pointed to three specific factors: (1) the settling parties did not obey the circuit court's order directing them to allocate the settlement amounts among the plaintiffs' theories of recovery, (2) the circuit court had no evidence to determine if the settlement was reasonable due to the limited facts before it (the case was still in the pleading stages), and (3) there was language in Safeco's settlement agreement regarding an assignment of Safeco's rights, which arguably may have been in contravention of the Contribution Act. *Id.*

¶ 100    John Crane specifically relies on *Cianci*'s discussion of the circuit court's lack of evidence to make a determination of good faith. The facts of *Cianci*, however, are inapposite. In *Cianci*, the court noted that "[a]t the time of the settlements, the case was still in the pleading stage. Motions to dismiss filed by Brouwer Brothers and American Cleaning remained pending. Only Safeco had answered plaintiffs' second amended complaint, and it had done so in a way that framed factual issues to be resolved in the case." *Id.* at 783. Unlike *Cianci*, the record in this

case was fully developed, as the parties sought good faith findings just prior to trial. The trial court had before it all of the pleadings, motions, and depositions, which included those of the plaintiff as well as the experts. The trial court here was well aware of the facts of the case. Moreover, the concern the *Cianci* court expressed over the allocation of the settlement amounts involved allocation in respect to the plaintiffs' various theories of recovery; *i.e.*, the negligence, intentional tort, and vicarious liability claims. *Id.* at 782. This is because, under the Contribution Act, contribution for intentional tort and vicarious liability claims is unavailable. Therefore, the *Cianci* court was concerned that "the settling parties' failure to allocate the settlements among plaintiffs' various theories of recovery [would] foreclose[ ] Brouwer Brothers from seeking a setoff." *Id.* at 783. That is not an issue in this case where plaintiff proceeded solely under a negligence theory and subsequently received a setoff in the amount of $1,137,500.

¶ 101    John Crane asserts that the trial court must examine the totality of the circumstances surrounding the settlement in light of the Contribution Act's policy of equitable apportionment of damages. John Crane maintains, citing *Ross v. Illinois Central R.R. Co.*, 2019 IL App (1st) 181579, ¶ 27, that the totality of the circumstances includes the amount paid, the amount that the settling defendant could pay, the amount of the plaintiff's claims, and the defenses of the settling and nonsettling defendants. We agree with these propositions of law; the trial court must examine the settlement agreement under the totality of the circumstances. See *id.* We, however, disagree with John Crane's bare assessment that the trial court did not do so in this instance. While the trial court did not expressly state that it reviewed the settlement agreements, there is nothing in the record to suggest that the trial court did not review the settlement agreements as required. See *Johnson*, 203 Ill. 2d at 136 (the fact that the circuit court did not conduct a hearing does not mean that it failed to consider the appropriate factors). Indeed, John Crane cites no case law that requires the terms of the settlement be stated on the record or provided to a third party not privy to the contract itself. *E.g.*, *Cianci*, 356 Ill. App. 3d at 780; *Ross*, 2019 IL App (1st) 181579, ¶ 27; *Mercola v. Abdou*, 223 F. Supp. 3d 720, 732 (N.D. Ill. 2016); *Warsing v. Material Handling Services, Inc.*, 271 Ill. App. 3d 556, 560-62 (1995); *Stickler v. American Augers, Inc.*, 303 Ill. App. 3d 689, 693-94 (1999). While the terms of the settlement agreements in the aforementioned cases were not in the record on appeal, none of these reviewing courts found that in order to have a legally valid settlement agreement the trial court must create a record of the settlement terms.

¶ 102    As stated previously, the trial court had before it all of the pleadings, motions, and depositions when it entered the good faith findings. The trial court was aware that plaintiff was proceeding to trial on its negligence count and that plaintiff sought in excess of $50,000. The trial court was also aware that John Crane would be asserting a sole proximate cause defense; specifically, that the insulation manufactured by other named defendants was the proximate cause of O'Reilly's pleural mesothelioma. Our case law is clear that "[s]ettlements are not designed to benefit nonsettling third parties." *Muro v. Abel Freight Lines, Inc.*, 283 Ill. App. 3d 416, 420 (1996). "They are instead created by the settling parties in the interests of these parties." *Id.* "If the position of a nonsettling defendant is worsened by the terms of a settlement, this is the consequence of the refusal to settle." *Id.*

¶ 103    We further observe that John Crane did not request an evidentiary hearing and, even if it had, a separate evidentiary hearing is not required. Indeed, our supreme court has consistently stated that "a trial court need not decide the merits of the tort case or rule on the relative

- 23 -

liabilities of the parties before making a good-faith determination. [Citations.] A court is capable of ruling on good faith without a precise determination of the overall damages suffered by the plaintiff and the settling tortfeasor's proportionate liability." (Internal quotation marks omitted.) *Antonicelli*, 2018 IL 121943, ¶ 27 (quoting *Johnson*, 203 Ill. 2d at 139).

¶ 104 Based on the record before it, we cannot say that the trial court's good faith findings were "clearly against logic, arbitrary, exceed[ed] the bounds of reason or [ran] contrary to recognized principles of law." *Miranda*, 2013 IL App (1st) 122674, ¶ 16. Accordingly, we affirm the judgment of the circuit court.

¶ 105                                          CONCLUSION
¶ 106 For the reasons stated, we affirm the judgment of the circuit court of Cook County.

¶ 107 Affirmed.